EVA E. COOK, Administratrix, Appellee, v. UNION PACIFIC
RAILROAD COMPANY, Appellant.

MASTER AND SERVANT: Statutory Regulation—Federal Safety
1  Appliance Act—Construction—"Grabirons." The Federal Safety
   Appliance Act, since July 1, 1911, has absolutely prohibited any
   interstate common carrier from using any car "having ladders,"
   unless such car is "equipped with *secure* handholds or grabirons
   on their roofs at the top of such ladders." (Section 2, Supple-
   mental Act of April 14, 1910, 36 Stat. at L., p. 298.) Section 3
   of said Supplemental Act, directing the Interstate Commerce Com-
   mission to designate *standards* for said appliances, and to extend
   the time in which such appliances may be applied on "cars actu-
   ally in service upon the date of the passage of this act," in no
   wise limits the parent prohibition of said Section 2, such granted
   extension being only a grant of time in which to change from the
   carrier's conception of a "secure" handhold, etc., to the standard
   fixed by the commission.

MASTER AND SERVANT: Pleadings—Statutory Exceptions. When
2  a statute gives a cause of action and, in a *subsequent* section
   thereof, provides for an exception, such exception becomes a mat-
   ter of defense to be pleaded and proven by him who relies thereon.
   So held, *arguendo*, as to a contention as to the proper construction
   of an act supplementary to the Federal Safety Appliance Act.

NEGLIGENCE: Proximate Cause—Establishing Theory. Facts and
3  circumstances sufficient to establish a theory must be (a) con-
   sistent with such theory, and (b) inconsistent with any other rea-
   sonable theory. Evidence reviewed, and held sufficient to establish
   that deceased met his death from an insecure grabiron on top of a
   freight car.

   PRINCIPLE APPLIED: An interstate freight train, during a
   heavy wind, passed eastward at from 35 to 45 miles an hour,
   through a town and without stop. Deceased, a brakeman, was
   seen on the south side of the top of a car, where it was his duty
   to be, leaning forward and facing the east, and sitting on the
   edge of the car and near and west of a descending ladder. With
   his left hand, he was holding onto, and bracing himself with,
   something which came out from the edge of the car near the top
   of the ladder, at which latter point the Federal Safety Appliance
   Act required a *secure* grabiron. The train appeared to take up

slack or increase its speed, and instantly deceased lurched forward and disappeared in the dust. An onlooker, as the car on which deceased had been seen passed him, saw what looked like a grab-iron hanging from the car seven or eight inches, and at the point where deceased had been seen when he fell. Other witnesses said they saw deceased take hold of the grabiron on top of the car. This testimony was modified, to a greater or less extent, on cross-examination, and there was testimony contradictory and inconsistent therewith. The train crew learned of the accident at the next station. A hasty examination was then made of the entire train, with no particular car in mind, and there was testimony that no loose handholds were discovered. Held sufficient to support a finding (a) that there was an insecure handhold on the car on which deceased was sitting, and (b) that such insecure handhold was the proximate cause of the death of deceased.

MASTER AND SERVANT: Assumption of Risk—Interstate Commerce—Insecure Grabirons. The imposition, by the Federal Safety Appliance Act, of an absolute, unqualified duty to maintain secure handholds and grabirons on interstate cars, leaves no room for the application of the doctrine of assumption of risk by remaining in the employment with knowledge that the law was not complied with.

*Appeal from Pottawattamie District Court.*—O. D. WHEELER, Judge.

THURSDAY, JUNE 29, 1916.

REHEARING DENIED, TUESDAY, DECEMBER 18, 1916.

ACTION to recover damages for personal injury, based on the Federal Employers' Liability Act. Opinion states the facts. Verdict and judgment for the plaintiff. Defendant appeals.—*Affirmed.*

*Edson Rich, A. G. Ellick* and *George S. Wright,* for appellant.

*Mayne & Green* and *Thomas Q. Harrison,* for appellee.

GAYNOR, J.—Plaintiff brings this action as administratrix of the estate of one Paul O. Cook, under the provisions of the

Federal Employers' Liability Act. She brings it for the benefit of herself, as surviving widow, and for the benefit of six minor children under the age of fourteen years, claiming that they are all wholly and solely dependent on the deceased for maintenance and support. As a ground for action, she claims that, on the 21st day of March, 1913, Cook was in the employ of the defendant as a brakeman on one of defendant's freight trains moving from Grand Island, Nebraska, to Council Bluffs, Iowa; that, when the train on which he was riding reached Central City, Nebraska, he was on the top of one of the cars, pursuing his duty as brakeman, and was sustaining himself by holding onto a handhold or grabiron on the roof of the car, at the top of the ladder, which extended down the side of the car; that, while he was so sustaining himself, the handhold or grabiron, not being secure, gave way by reason thereof, and deceased fell violently to the ground, and received injuries which caused his death; that the deceased was not guilty of any fault or negligence on his part contributing to his injury and death, but his injury and death were due to the negligence of the defendant in this: that the handhold or grabiron on the roof of the car on which he was seated, of which he had hold just prior to the accident, was not secure, as required by law, but, on the contrary, was unsafe and insecure; that by reason of his death she has suffered damages.

Defendant, answering this petition, admits sufficient facts to bring the case within the Federal Employers' Liability Act; admits that Cook was an employee in the service of the defendant as brakeman; admits that he came to his death near the town of Central City, Nebraska, on March 21, 1913; but alleges that his death resulted from dangers and risks which were open, obvious, apparent and known to the deceased, and which were incident to his employment, and assumed by him; that he was guilty of negligence which proximately contributed to his death. Defendant further alleges that, on March 13, 1911, the Interstate Commerce

Commission of the United States extended the period of time within which defendant and all common carriers were required to comply with the provisions of the Safety Appliance Act, in so far as the act required defendant to equip its freight cars with roof handholds at the top of the ladder. Defendant also filed a general denial to all the allegations of plaintiff's petition not specially admitted.

Upon the issues thus tendered, the cause was tried to a jury, and a verdict returned for the plaintiff. From this verdict, judgment being entered, defendant appeals.

The first question presented involves the sufficiency of the evidence to sustain the verdict, and on this point it is contended that there was not sufficient evidence to show that there was, in fact, an insecure handhold on the top of the car from which deceased fell, and, if such is shown to be the fact, the evidence does not affirmatively show that the insecure handhold was the proximate cause of his fall from the car and the injuries consequent thereupon. Or, in other words, that the proofs offered and introduced by the plaintiff do not sustain the issue tendered by the plaintiff upon which she predicates her right to recover.

The second question involves the construction to be given to the act of the Interstate Commerce Commission in extending the time for compliance with the provisions of the acts of Congress requiring cars to be equipped with handholds or grabirons on the top, with this further question involved: Conceding that the act of the Interstate Commission applied to *certain cars* used by the defendant, and extended the duty of complying with the requirements of the act of Congress until July 1, 1916, on whom rested the burden of proof to show that this car, if not supplied with secure handholds, came under the exception, and not under the rule of the statute? We will take up the second proposition first.

The foundation of the present Safety Appliance Act was passed and approved March 2, 1893. See 27 Statutes at

Large 531, Chapter 196.   This act was passed to promote

1. MASTER AND
SERVANT: stat-
utory regula-
tion: Federal
Safety Appli-
ance Act: con-
struction:
"grab-irons."

the safety of employees, by compelling common carriers engaged in interstate commerce to equip their cars with automatic couplers and continuous brakes, and their locomotives with driving wheel brakes, and for other purposes.   Section 4 of this chapter provides:

"That from and after the first day of July, 1895, until otherwise ordered by the Interstate Commerce Commission, it shall be unlawful for any railroad company to use any car in interstate commerce that is not provided with secure grabirons or handholds *in the ends* and *sides* of each car for greater security to men in coupling and uncoupling cars."

Certain amendments were made to this statute, and approved April 14, 1910, and March 4, 1911.   These may be found in 36 Statutes at Large, pages 298 and 1397 respectively.   It will be noted that there is no provision in these acts relating to handholds on top of cars.   An act approved April 14, 1910, supplemented the act hereinbefore referred to, and is found in 36 Statutes at Large, at page 298.   The sections material to this controversy are Sections 2 and 3 of Chapter 160 of this act, which provide:

"Sec. 2.   That on and after July 1st, 1911, it shall be unlawful for any common carrier subject to the provisions of this act, to haul, or permit to be hauled or used on its line, any car subject to the provisions of this act not equipped with appliances provided for in this act, to wit: All cars must be equipped with secure sill steps and efficient hand brakes; all cars requiring secure ladders and secure running boards shall be equipped with such ladders and running boards, and all cars having ladders shall also be equipped with secure handholds or grabirons on their roofs at the tops of such ladders:   Provided that, in the loading and hauling of long commodities, requiring more than one car, the hand brakes may be omitted on all save one of the cars while they are thus combined for such purpose.

"Sec. 3.   That within six months from the passage of this act, the Interstate Commerce Commission, after hearing, shall designate the number, dimensions, location, and manner of application of the appliances provided for by Section 2 of this act and Section 4 of the act of March 2, 1893, and shall give notice of such designation to all common carriers subject to the provisions of this act by such means as the commission may deem proper, and thereafter said number, location, dimensions and manner of application as designated by said commission shall remain as the standards of equipment to be used on all cars subject to the provisions of this act, unless changed by an order of said Interstate Commerce Commission, to be made after full hearing and for good cause shown; and failure to comply with any such requirement of the Interstate Commerce Commission shall be subject to a like penalty as failure to comply with any requirement of this act: Provided, That the Interstate Commerce Commission may, upon full hearing and for good cause, extend the period within which any common carrier· shall comply with the provisions of *this section* with respect to the equipment of cars actually in service upon the date of the passage of this act.   Said commission is hereby given authority, after hearing, to modify or change, and to prescribe the standard height of drawbars and to fix the time within which such modification or change shall become effective and obligatory, and prior to the time so fixed it shall be unlawful to use any car or vehicle in interstate or foreign traffic which does not comply with the standard now fixed or the standard so prescribed, and after the time so fixed it shall be unlawful to use any car or vehicle in interstate or foreign traffic which does not comply with the standard so prescribed by the commission."

Subsequent to the passage of this act, and on March 13, 1911, the Interstate Commerce Commission, in pursuance of the authority vested in it by Section 3, last above quoted, designated the dimensions, location and manner of application

of roof handholds; and, on the same day, and in pursuance of the authority vested in them under said section, made and enacted the following:

"Carriers are granted an extension of five years from July 1, 1911, to *change* and apply all other appliances on freight train cars to comply with the standards prescribed in said order, except when a car is shopped for work, amounting to practically rebuilding body of car, it must then be equipped according to the standards prescribed in said order in respect to handholds, running boards, ladders, sill steps and brake staffs: provided, that the extension of time herein granted is not to be construed as relieving carriers from complying with the provisions of Section 4 of the Act of March 2, 1893, as amended April 1, 1896, and March 2, 1903."

Analyzing these statutes, we find that Section 4 of the Act of March 2, 1893, 27 Statutes at Large 531, required that all cars engaged in interstate commerce should be provided with secure grabirons or handholds in the *ends* and *sides* of the car, and made it unlawful to operate a car without grabirons and handholds as required.

Section 2 of the Act of April 14, 1910, 36 Statutes at Large 298, added further duty in respect to handholds, and provided for secure grabirons or handholds on the top of the cars, or on the roof of the cars at the top of the ladders, and prohibited the use of cars without such handholds. Neither of these sections provided anything further touching these handholds, except that they should be on the *ends* and *sides* and *top* of the *car*, and *securely fastened*.

Section 3 of the last act provided that the Interstate Commerce Commission, within six months after the passage of the act, should fix uniform standards, which should remain thereafter as the standards of equipment to be used on all cars. The statute required the handholds. It was given to the commission to fix the standards of equipment to comply with the requirements of the statute. Congress made it a duty to provide secure handholds, and ordered their use, and

it was given to the Interstate Commerce Commission to fix later the standards.

The duty to provide secure handholds, required by the act, became operative on the 1st day of July, 1911, and rested upon the company as to all cars put in use and operated after that date. Later, when the commissioners had acted and had fixed a standard, then it became the duty of the company to change, and equip their cars with the same appliances, in accordance with the standard fixed. There were many cars in actual use at the time the Act of 1910 was passed. Many of these cars continued in actual use, no doubt, up to the time this act became effectual. This act was approved April 14, 1910. That provision requiring the placing of handholds did not go into effect until July 1, 1911. Section 2 of the act required handholds to be securely fastened on the roof of the car at the top of the ladder, from and after that date. It will be noticed that carriers were given more than a year in which to equip their cars with these secure handholds at the top of the ladder, before the requirement became binding upon them. This, no doubt, to enable them to place these handholds in compliance with the statute by the time the statute went into effect. Therefore, many of these cars must have been equipped to comply with this section at the time the act took effect.

Later, when the commission had acted and had fixed the dimension and location of these handholds, then it became the duty of the carriers to change their handholds to comply with the standard so fixed. No doubt it was conceived that a change of this character might take some time; so the Interstate Commerce Commission was given power to extend the time for making these changes to comply with the standard fixed by the commission. Assuming that the carriers had complied with the requirements of Section 2 and placed *secure handholds* at the top of the ladders, we must assume that, at the time, all cars that were put in use were supplied with handholds at the top of the ladders, to comply with

the requirements of Section 2. As to these cars so equipped, it was given to the commission to extend the time in which changes could be made to comply with the standards; so it was provided that the commission might extend the period, after adopting a standard, to enable the carriers to change their equipment to comply with the standard fixed, but only as to cars actually in service upon the date of the passage of the act. It was under this power given the commission that they granted an extension of five years to change and apply these handholds to meet the requirements of the standard fixed by the commission.

The commissioners were not given authority to suspend the provisions of Section 2 of the Act of April 14, 1910, or the provisions of Section 4 of the Act of March 2, 1893. The authority given the commission, as said before, was to fix standards, and then to extend the time in which the companies might adjust themselves to the new standards, or to the standards fixed, by changing the handholds, already required and undoubtedly on the cars, to comply with the standards so fixed. Six months were given the commissioners to fix the standards. They did not fix the standards until nearly a year afterwards; and, at the time they fixed the standards, they made an order extending the time for five years in which to change and apply all other appliances on freight cars, to comply with the standards prescribed in the order made by the commissioners on all cars in use at the time of the taking effect of the act of Congress requiring the placing of handholds. The standards fixed by the commissioners, by the very act that authorized them to fix standards, said that, thereafter (that is, after the standards were fixed), they should remain as the standards of equipment, and a failure to comply with the standards so fixed, after they were fixed, subjected the offending party to a like penalty as for a failure to comply with the requirements of the act itself.

It would seem, therefore, that the extension of time given

by the Interstate Commerce Commission relied upon, would not relieve the company of the obligation to discharge the duty imposed upon it by the second section of this act. It could not be claimed that, if the commissioners had never fixed the standards, the company would be immune from punishment if they failed to comply with the requirements of Section 2, and provided cars having ladders with *secure* handholds or grabirons on the roof at the top of the ladders; nor could it be claimed that, if the Interstate Commerce Commission had failed to make any extension of time, then the company would be relieved of the duty to comply with Section 2, touching handholds, even as to cars which were in use at the time of the passage of the act.

We are inclined to think that the power given to the Interstate Commerce Commission to extend the time in which common carriers were required to comply with the provisions of the act, related only to those provisions of Section 3 touching the standards to be fixed by the Interstate Commerce Commission. Or, in other words, it was intended that, when the Interstate Commerce Commission fixed the standards, all companies should change so as to comply with those standards in equipping their cars; that, as to the cars already in use, or in use at the time of the taking effect of the act, the commissioners could extend the time for changing the equipment to comply with the standards. What the commissioners undertook to do was to grant to carriers an extension of five years in which to change appliances on freight train cars, to comply with the standards prescribed in the order. All cars put in use after the act went into effect, must be equipped as the act required. All cars practically rebuilt were required to be equipped according to these standards fixed by the commission. The authority delegated to the commissioners was to fix standards, and to extend the time in which carriers who had cars already in use at the time of the act should comply with these standards, and equip their cars in accordance with the requirements of the standards.

Until the commissioners met and fixed the standards, the law did not require any particular standards, but said that the handholds should be placed as required by the act, and be secure.

The act provided a penalty for a violation of Section 2, requiring handholds securely fastened on the roof of the car. Section 3 provided a like penalty for a failure to equip the car according to standards fixed by the commissioners, for the act says:

"Failure to comply with any such requirement of the Interstate Commerce Commission fixing the standards shall be subject to a like penalty as failure to comply with any requirement of this act."

We are inclined to think that the authority given the Interstate Commerce Commission, and the act of the Interstate Commerce Commission in extending the time, did not relieve railroad companies from complying with the provisions of Section 2, requiring securely fastened grabirons on the roof, but did give authority to the commissioners to extend the time; and they did extend the time in which the companies operating cars at the time the act went into effect were to make the changes in equipment, to comply with the *standards* required by the order of the commissioners. However this may be, it is certain that the act gave to the commissioners only the right to extend the time for compliance with Section 3 and the provisions of the commission fixing standards, as to cars that were in actual use at the time the act went into effect.

The defendant alleges, proves and relies upon the fact that the Interstate Commerce Commission took action under delegated power found in Section 3, and fixed the standards to be used by the companies thereafter; that it extended the time within which common carriers should comply with the provisions of Section 3 and the standards fixed by the commissioners, under the authority of this section. The company seeks to shield itself from liability for a failure to comply

with the requirements of Section 2, by showing this act of the Interstate Commerce Commission, extending the time for changing appliances to comply with the standards, and says that the period fixed in the order of the commission had not arrived at the time the accident occurred. Assume this to be true, and that, after the passage of the act requiring handholds on the roof at the top of the ladder went into effect, the commissioners met and fixed the standards of construction, and extended the time in which changes might be effected to comply with the standard, of what avail is this to the defendant? This might be available if liability were predicated on a failure to have a standard handhold—one that complied with the standard fixed by the commissioners. This would be available for the reason that the time had not arrived, under the order of the commissioners, for the change to standard handholds. Concede that it was not required to have standard handholds at the time of the accident: this is no defense to a charge that it failed to comply with the requirements of Section 2, which required a handhold at the top of the ladder on the roof of the car, securely fastened. The record discloses, and the contention is, that it did have a handhold on the roof of the car at the top of the ladder, but that this handhold was not securely fastened, as required by this section. The basis of the claim is that it had a handhold on the roof of the car at the top of the ladder, but that this handhold was insecure, and was the proximate cause of plaintiff's fall to his death. It was required to have such a handhold on the top of its cars from and after the first of July, 1911. If it failed in this, it failed in its duty, although not required, at the time of the accident, to have it of standard make. We may concede that it had not complied with the standards fixed by the Interstate Commerce Commission, although there is no evidence on this point. We may concede that it was not required to comply with the order of the commission, at the time of the accident, because of the exten-

sion of time to make the change as to the standard; and yet the plaintiff's case remains, if sustained by proof that deceased came to his death by the failure of the company to have on the roof of its car, at the top of the ladder, a secure handhold or grabiron. Section 2 of the act makes it the duty of the company to have secure handholds or grabirons on the roof at the top of the ladder. It follows, therefore, that the extension of time granted by the commissioners relates only to cars in actual use at the time of the taking effect of the act which required the putting on of handholds. The extension does not relieve the company from the duty of maintaining secure handholds until the end of the extension, but the extension relates only to changing the handholds, so as to comply with the standards fixed.

Even if we were to accept the defendant's contention, and say that the time granted by the commissioners related to all cars in actual use at the time of the taking effect of the act, and that no duty rested upon the company to have either secure or standard handholds on the roof of such cars, at the top of the ladder, at the time of the accident, yet we are met with the proposition that this act could, even under defendant's theory, relate only to cars that were in actual use at the time of the taking effect of the act. These cars, then, if defendant's contention is accepted, are to be excepted from the duty imposed on carriers by Section 2, and excepted from that rule because of the action of the commissioners. There is no evidence that the car in question was in actual use at the time of the taking effect of the act. There is no evidence that this car comes within the exception that relieved the company from having the handholds required at the time of the accident. The defendant, seeking to avail itself of this exception, has the burden of proving that it is within the exception, and that this car was one of the cars to which the extension applied. There is no evidence upon this point. We cannot assume that this car was within the exception.

2. MASTER AND SERVANT: pleadings: statutory exceptions.

The duty imposed by Section 2 is general, and rested upon every company, from and after the 1st of July, 1911; and, if defendant desired to avail itself of its own contention, it should have brought within the exception the car complained of, to get the benefit of the extension. It is a general rule that, where an action is predicated upon a statute to which there is an exception or proviso, if the proviso or exception be found in a separate section, or in a subsequent and substantive enactment, it is a defense, and, if relied upon, the facts that bring it within the exception must be pleaded and proven. This is a rule of general application. See *First National Bank of Davenport v. Baker,* 57 Iowa 197; *State v. Van Vliet,* 92 Iowa 476. On this branch of the case, we must, therefore, hold against the defendant's contention.

As pertinent to the controversy provoked by this action, though not directly bearing on the matters herein discussed, we call attention to the following cases: *Chicago, B. & Q. R. Co. v. United States,* 220 U. S. 559 (55 L. Ed. 583); *St. Louis, I. M. & S. R. Co. v. Taylor,* 210 U. S. 281 (52 L. Ed. 1061). In this last case, it is said:

"The Congress, not satisfied with the common-law duty and its resulting liability, has prescribed and defined the duty by statute. . . . The obvious purpose of the legislature was to supplant the qualified duty of the common law with an absolute duty, deemed by it more just. If the railroad does, in point of fact, use cars which do not comply with the standard, it violates the plain prohibitions of the law, and there arises from that violation the liability to make compensation to one who is injured by it."

See also *Texas & P. R. Co. v. Rigsby,* 36 Sup. Ct. Rep. 482.

Some of the fact questions are not in dispute. It is not disputed that the deceased was and had been an employee

3. Negligence: proximate cause: establishing theory.

of and in the service of the defendant, as brakeman, prior to and at the time of his death; that, on the 21st day of March, 1913,

he was so engaged upon one of defendant's freight trains; that the train was employed in interstate commerce; that, while the train was in motion, it was the duty of the deceased, as brakeman, to go over the top of the cars and upon the ladders on the sides of the cars; that, when the train reached Central City, Nebraska, it was the duty of deceased to be on the top of the car, for purposes connected with his employment; that he fell from the car while so engaged, and received injuries from which he died; that the plaintiff is administratrix of his estate, and brings this action for and in behalf of his widow and children.

This brings us to a consideration of the sufficiency of the evidence to justify the verdict. This presents two questions: (1) Does the evidence disclose that there was an insecure handhold on the top of the car from which the deceased fell? (2) Was this insecure handhold the proximate cause of his fall?

As to whether the defective condition of the handhold was due to defendant's negligence, is immaterial, since the statute imposes an absolute, unqualified duty to maintain the appliances in a safe condition. Continuing to work, with knowledge of the defective condition of the handhold, is not a bar to recovery; nor is the injured party to be treated as having assumed any of the risk which flowed from the act of the company in failing to perform its statutory duty, although continuing in the employment with the knowledge of its failure to discharge this duty. See authorities cited above, and *Delk v. St. Louis & S. F. R. Co.*, 220 U. S. 580 (55 L. Ed. 590); *Missouri, O. & G. R. Co. v. Plemmons* (Texas), 171 S. W. 259.

4. MASTER AND SERVANT: assumption of risk: interstate commerce: insecure grabirons.

In determining the right of plaintiff to recover, under the evidence submitted, the mind is directed to a consideration of the two propositions above stated, unembarrassed by any consideration of those qualifying duties and obligations which arose under the common-law rule, as applied to actions

based on negligence. The witness especially relied on by the plaintiff to establish the ultimate facts referred to above, is one Frank Derr, a barber in the town of Central City, Nebraska. Some controversy is made as to whether this witness was in the town of Central City at the time of the accident, and it is contended that the evidence upon this point is of such uncertain and unsatisfactory character that the jury was not justified in accepting his statements to the effect that he was in Central City on that day, and made observation touching this train and the deceased's position on the train immediately prior to the injury. Of all who appeared before the jury on this question, he was best qualified to state the truth touching the fact. There is no ground for any quibbling on this question. If he was there, he knew it. If he was not there, he has deliberately detailed facts which he could not have known if he had not been there, and facts which he must have learned independently of any personal observation or contact with the facts disclosed. His testimony is direct and to the point, that, on this particular day, he was in the city, employed by one Shileds in his barber shop; that he saw this train approaching; saw the deceased on top of the car; saw him sitting at a point where the ladder descends from the car, at the top of which a secure handhold was required; saw him sitting there and holding onto something—he thinks to this handhold; saw him suddenly lurch forward and disappear from the car. He further testifies that, when deceased disappeared from the top of the car, the witness was unable to see what became of him, because of the dust; that he watched the car on which deceased was sitting until it reached him, thinking perhaps the deceased was clinging to the car; that, as the car approached and passed, he saw an iron extending out at the point at which he saw deceased fall from the car, and where the handhold was required to be placed. He was shown a handhold or grab-iron, such as it was claimed was used on the car. He said the iron shown him resembled the one upon the car which

he observed as the car passed. His testimony to this effect is that he saw a man sitting on the edge of the car at the top of the ladder, holding onto something; that he saw him fall, but didn't see him alight upon the ground, because of the dust. He then testified:

"When I saw the man fall off, I kept my eye on the car until it came to me, thinking I could pull him out, maybe. He had hold of something with his left hand before he fell. The train seemed to give a kind of lurch, and I saw him swing off. He had hold of something which came out from the edge of the car when he fell. The something that he had hold of, which I called the thing, was an iron about the size of a cane. It looked like the iron you have in your hand (referring to a grabiron shown him). When the car got to me, this iron, or thing to which he appeared to be holding at the time he fell, was hanging from the car, 7 or 8 inches. I saw it was an iron as it passed me. There was a ladder up and down the car at this point. He sat west of the ladder, and had hold of something on the top of the car with his left hand. The train was moving east. It appeared just before he fell that he was bracing himself with something; that he had his hand on something and was leaning forward and looking east toward the head of the train. The train lurched, as if taking up slack or something, or that the engineer gave the train more speed. When the train lurched, he appeared to have hold of this rod, was thrown off the car and disappeared."

He estimated the speed of the train at from 35 to 45 miles an hour when it passed him.

Two other eyewitnesses were called by the defendant, Grace Thompson and Marie Smith. Their testimony is to the effect that, on the day of the injury, they were driving into town in a covered buggy, with a single horse, with side curtains on and the back curtains down. Grace Thompson testifies that they were driving east—the same direction the

train was going; that she was sitting in the buggy on the side next to the track, and was driving; that, when she heard the noise of the train, she looked to see whether it was a freight or passenger, as her horse was nervous; that through a crack in the curtain she looked back and saw the train— saw a man on top of the train about half way back from the engine; that he was walking east. She testified:

"We discussed the danger incident to a man's position on such a windy day. The wind was blowing awfully strong. I saw him reach ahead—don't know what he reached for; although there was one of those steering wheels on the car ahead of him. The next time I noticed him, he was just starting down the ladder on the side of one of the cars at the front end of the right-hand side. When I first saw him going down the ladder, he was holding the grabiron at the top of the car. I saw him when he was half way down. I then glanced at my horse, and again at the track, and I saw him rolling. I saw him come down to where the grabiron is on the corner on the top of the car, and I saw him reach down and take hold of it. The horse was cutting up a good deal, and we had two children in the buggy. When he took hold of the grabiron, he didn't sit down on the car; he stooped over. It was a matter of a very few seconds before the train was clear past, at the rapid rate at which it was traveling. When I first saw him, he was at the east end of the car. He was walking slowly across the top of the car. I saw him have hold of the grabiron on the top of the car. There was an interim of space, or a second of time, that I did not see the train, because the horse was rearing. I was holding one of the children in my lap. The train was just opposite where the buggy was, when I noticed him on the side of the car. When he started down the side of the car, he had hold of the grabiron at the top of the car. Then I glanced at the horse again, and the next time I glanced at the train, he was rolling. I didn't see him in the air at all."

Mrs. Smith testified:

"I saw him walking a little distance; then he started down the ladder; then he fell. He started down the ladder on the south side. When I last saw him, he had just gotten nicely started. He had hold of the handhold on the side of the car when I saw him on the car. When I last saw him, he was falling. Just before I saw him in the act of falling, he was coming down the car."

On cross-examination, she testified:

"While I saw him, he was on the same car that he fell from. He walked the full length of the car, but he didn't go clear to the end, but went to the place where the ladder was, which is on the end. He had nicely started down the ladder and had hold of the handhold. He had hold of the handhold on the top of the car when I last saw him. He fell backwards. He fell as though he had come with force. His head went first. There was a handhold right at the top of the car." She further said: "I don't know whether it was at the top of the car or just below the top."

We marvel somewhat that these ladies saw as much as they say they did—the side curtains on, the back curtains down, and with a rearing horse and a couple of infants to distract their attention. That they saw him at the place where Derr says he saw him, tends to corroborate Derr. That he had hold of the handhold just before he fell, is quite in keeping with Derr's testimony. That he was attempting to sit down on the corner of the car when he stooped and took hold of this handhold, and that he sat down on the car by the side of the ladder, is not inconsistent with the testimony of these ladies. It establishes this fact also, in support of Derr's testimony, that he was at the point where the statute required the handhold or grabiron to be —on the roof of the car; that he had hold of it, was attempting to do something, either to seat himself on the side of the car or to descend the ladder; and that, while in the act of either seating himself or descending the ladder, and while

sustaining himself with this handhold, he was precipitated to the ground and injured. From this testimony, uncontradicted, the jury might well find that there was a handhold on the top of this car; that it was not securely fastened; that the deceased was sustaining himself by the handhold; that it gave way, and he was precipitated to the ground. This evidence was given by witnesses wholly disinterested, so far as this record shows, in the result of this controversy. The jury might well accept it as true, and, accepting it as true, was justified in reaching the conclusion that the deceased's death came as a proximate result of defendant's failure to have the handhold securely fastened on the roof of this car, at the point where the deceased was at the time, in the discharge of his duty, and that this failure was the proximate cause of his injury.

The train crew did not discover the fact that deceased had fallen, until they passed through the town of Central City and stopped at a station to the east. It is claimed that they then learned that he had fallen from the car, but no details were given as to the cause of his fall; that they then made an examination, and, by subsequent examinations, discovered that there were no loose handholds on this train. It was not shown that, when these examinations were made, the examiners had in mind the special car from which he fell. The examination, if made at all, was a hasty examination of the entire train, and not of this particular car.

It would be profitless to review all this testimony. There are such inherent weaknesses in some portions of the testimony that it is practically without probative force upon this question, and the jury was well justified in disregarding it. One thing we are satisfied to say, and that is that it affirmatively appears, beyond, it would seem, fair controversy, that Derr was in Central City on that day; that he saw all that he says he saw; that these ladies were there on the road at that time, and saw all that they were able to see under the peculiar handicaps that attended their efforts, and

have fairly and honestly recorded their observations as they were able to recall them at the time of the trial.

There is no question about the general rule so frequently stated by this court, always substantially in the same language, that a theory cannot be said to be established by circumstantial evidence, even in a civil action, unless the facts relied on are of such a nature, and are so related to each other, that it is the more probable or reasonable conclusion to be drawn from it. It is not sufficient that they be consistent simply with that theory; for that may be true, and yet they may have no tendency to prove the theory. This rule applied means simply that, where one alleges that a certain condition or fact exists, and predicates liability for injury upon its existence, he must establish the existence of the fact relied upon, whether he attempts to do this by direct or circumstantial evidence; and it is not sufficient to show that he was injured, and that the injury could have, or might have, or possibly did, result from the condition complained of. The burden rests upon the one complaining to show the existence of the fact, or conditions complained of, and that their existence or nonexistence was the proximate cause of his injury, no matter by what class of testimony he seeks to establish the fact. In the case at bar, the plaintiff predicates her right to recover upon the existence of an insecure and unsafe handhold at the top of the ladder. She asserts that the deceased fell and was injured, and that the proximate cause of his fall and injury was this insecure handhold. If the evidence before the jury was sufficient to justify reasonably intelligent men in reaching a conclusion that her claim was well founded, then it is sufficient to support the verdict. It appeals to the mind as rational and reasonable that one who asserts a fact, and undertakes to prove the fact, must produce evidence of the existence of the fact, from which a reasonable mind can be reasonably sure that the fact exists. If, after the evidence is all in, it is a mere guess or speculation as to whether the fact exists, then the fact cannot be

said to be proven by the testimony, whether this testimony be in the form of direct evidence or circumstantial evidence. The general rule was announced in *Asbach v. Chicago, B. & Q. R. Co.*, 74 Iowa 248, and applied again in *Neal v. Chicago, R. I. & P. R. Co.*, 129 Iowa 5. In this last case it is said:

"If other conclusions may reasonably be drawn as to the cause of the injury from the facts in evidence than that contended for, the evidence does not support the conclusion sought to be drawn from it;" and it is further said in that case: "If it appears that the facts and circumstances from which a conclusion is sought to be deduced, although consistent with that theory, are equally consistent with some other theory, they do not support the theory contended for."

Of course, it does not support the theory contended for upon which liability is predicated, if the evidence is just as consistent with a theory which does not involve, or which relieves from, liability. To offer evidence of a state of facts which is simply consistent with the existence of the fact contended for, upon which liability is predicated, but which is also just as consistent with the existence of a fact or a conclusion upon which no liability can rest, does not establish the ultimate fact upon which liability may be predicated. For a later application of this rule, see *Kling v. Chicago, M. & St. P. R. Co.*, 115 Iowa 133; *Gibson v. Iowa Central R. Co.*, 136 Iowa 415. The rule as announced, when analyzed, means simply that, where one predicates liability on the fault of another, he must not only prove the fault relied upon, but that the injury suffered is traceable to the fault. It is not sufficient to show the fault, but the complainant must go further, and show that the proven fault was the proximate cause of the injury sustained. Though the fault be proven, yet, if the injury sustained could just as well have resulted from some other cause than the proven fault, or if the evidence does not so closely connect the injury with the proven fault as to exclude any other reasonable hypothesis than that the injury was the proximate result of the proven fault,

then it cannot be said that the complainant has proven that the fault relied upon was the proximate cause of his injury. In other words, if any other reasonable conclusion as to the cause of the injury may be drawn from the facts in evidence, other than the fault relied upon to recover, then the evidence does not support the conclusion that the injury was the result of the fault or negligence charged. Of course, the evidence cannot be said to support the conclusion that the injury was the proximate result of the fault complained of, if the evidence is just as consistent with a theory as to its cause, which does not involve the fault charged, or may be traceable to some other fault not charged, or one which does not create liability. The fault must be proven, and the inference drawn from the proven fault must lead the mind to a satisfactory conclusion that the proven fault was the proximate cause of the injury.

We are satisfied that the verdict is not so unsupported by the evidence that we would be justified in interfering, especially in view of the fact that the trial court before whom the case was tried did not deem it his duty to sustain defendant's contention upon this point.

Upon the whole record, we are satisfied that the case should be, and is,—*Affirmed.*

EVANS, C. J., DEEMER, LADD and SALINGER, JJ., concur.