ARTHUR M. THORNTON, Appellee, v. MINNEAPOLIS & ST. LOUIS RAILROAD COMPANY, Appellant.

**NEGLIGENCE:** Willfully Assuming Position of Danger. A servant 1 may not be said, under presented record, to have been negligent in placing himself in a position of danger, when the emergency was grave, and required quick action to prevent an explosion.

**MASTER AND SERVANT:** Federal Employers' Liability Act— 2 ''Unsafe'' Locomotive. The duty of an interstate railway carrier to only use "safe" engines is an *absolute* duty, under the Federal Locomotive Boiler Act, and the court should so instruct. (See U. S. Comp. Stat., Sec. 8639-a.)

**MASTER AND SERVANT:** Federal Employers' Liability Act— 3 Withdrawal of Assumption of Risk and Contributory Negligence. Assumption of risk and contributory negligence have no place in an action under the Federal Employers' Liability Act, when plaintiff rests his action solely on a violation by the master of a Federal act *enacted for the safety of employees.*

EVIDENCE: Best and Secondary—Scope of Employment. An em-
ployee, in the absence of better evidence showing definite lim-
itations, may testify what his duties were under specified cir-
cumstances.

EVIDENCE: Competency—Non-Expert—Condition of Injured Limb.
Plaintiff, a non-expert, may explain to the jury the condition
of his injured limb, especially when the expert testimony on
both sides of the controversy was in harmony therewith.

NEW TRIAL: Excessive Verdicts—$4,000. Verdict for $6,250 for
severe personal injury, reduced by the trial court to $4,000, held
not excessive.

*Appeal from Marshall District Court.*—B. F. CUMMINGS,
Judge.

DECEMBER 15, 1919.

ACTION for damages under the Federal Employers' Lia-
bility Act for personal injuries. The plaintiff was an en-
gine fireman, and sustained a compound fracture of the
arm. The defense was, in substance, a general denial.
There was a verdict for the plaintiff for $6,250, which was
reduced by the trial court to $4,000. The defendant ap-
peals.—*Affirmed.*

*C. H. E. Boardman, M. M. Joyce,* and *R. B. Alberson,*
for appellant.

*S. A. Anderson, F. E. Northup,* and *J. E. Holmes,* for
appellee.

EVANS, J.—The specification of negligence was that the
blow-off cock of the engine, upon which the plaintiff was
working, was defective as to its valve, and as to its dis-
charge pipe appurtenant thereto, in that the valve stuck,
and failed to close automatically, and in that the discharge
pipe was not securely fastened by an appropriate clamp,
so that the pressure of the escaping steam from the blow-off
cock forced it out of position, and threw a part thereof
against the plaintiff's arm.

On the morning in question, the engine started at Mason City for its run to Monmouth, Illinois. The plaintiff boarded it, as fireman, at 9:15, at Marshalltown, his run being from Marshalltown to Monmouth. At Gilman, the third station from Marshalltown, the engineer experienced trouble with the blow-off cock, in that the valve thereof wholly failed to close, with the result that the steam and water of the boiler were rapidly escaping.

The blow-off cock was a device for enabling the engineer to blow out the dirty sediment which settled in the mud-ring of the boiler. The mud-ring was the lowest point in the boiler, and was intended to catch the settlings. In the bottom thereof was an opening, which was covered with a steel valve. This valve was held in its seat by the pressure of the steam. A lever was so connected with it that the engineer could lift the valve by the application of force. When it was thus lifted, the steam and water, under great pressure, passed through it, carrying away the dirt. This blowing off was a momentary process, lasting but a second or two. The lever being released, the valve should settle back into its place at once. Appurtenant to this blow-off cock, and on the outside of the boiler, was a discharge pipe, about 2 inches in diameter, and about 18 inches in length. Through this pipe, steam and water were discharged, under a pressure of 180 pounds. For the purpose of deflecting such discharge, and thereby protecting the roadbed, the lower end of such discharge pipe was turned horizontally, at right angles to the perpendicular part. In order to hold such pipe securely in its position under the great pressure of steam, it was necessary that it be securely clamped.

On the occasion in question, the valve, having been opened by the lever of the engineer, failed to close. The engineer manipulated his lever, without success. The plaintiff got down from the engine, taking with him a long-handled pick, with which he attempted to tap the valve.

The supposition was that some substance had got under the valve and prevented it from settling into its seat. While the plaintiff was making his attempt, the pressure of the steam upon the discharge pipe drove it out of its position, and dislodged a part of it, and threw it with great violence against the plaintiff. This is the general outline of the facts of the accident. The contention for plaintiff is that the blow-off cock was in a defective condition. Such alleged defective condition was twofold:

(1) That the valve was defective, in that it did not close.

(2) That the discharge pipe was not securely fastened to its place, so that it failed to withstand the pressure to which the blow-off process necessarily subjected it.

The defendant denied the negligence, denied the alleged defects, denied that the defects, if any, were the proximate cause of plaintiff's injury, and specially pleaded that the plaintiff's own negligent acts were the sole cause of his injury.

I. The first error assigned as a ground of reversal is that the verdict was contrary to the instructions, and without support in the evidence. In support of this assignment, the defendant contends, not only that no defective condition was shown as to the appliances, and that the defects, if any, were not the proximate cause of the injury, but that it affirmatively appears that the plaintiff's own negligent acts were the sole cause of the injury. The plaintiff testified that the engineer said to him, when he started with his pick, "You can't get it," or, "Don't go near it." The engineer testified for the defendant that he did not know that the plaintiff had left the cab. It is urged by defendant that the blow of the pick by the plaintiff was the cause of the displacement of the discharge pipe, and that such displacement would not have occurred if the plaintiff had withheld

1. NEGLIGENCE: willfully assuming position of danger.

the blow. It is also urged that he put himself wrongfully in the place of danger, in violation of the orders of the engineer. These contentions are based upon inferences which are drawn from the evidence. The evidence is by no means conclusive thereon. There was sufficient basis in the evidence for a finding by the jury that these appliances were in a defective condition. Even the witnesses for the defendant who testified to an inspection immediately following the disaster disclosed that they found the blow-off cock and the clamp loose. We shall presently set out the Federal statute, which has an important bearing upon this point. Not only does the evidence fail to show conclusively that the accident was the sole result of the wrongful act of the plaintiff, but the jury could properly have found therefrom that his conduct was not wrongful at all. The failure of the valve to close created a grave emergency. The steam and water were rapidly escaping, and it was a question of only a brief time when the lowering of the water in the boiler would expose its crown sheet. Danger of explosion was imminent, unless something was done quickly. Unless the valve could be restored to its function, it would be necessary at once to extinguish the fire under the boiler. We see little ground, therefore, for holding, as a matter of law, that the activities of the fireman, under such circumstances, were wrongful or negligent.

II. Complaint is directed to Instruction 9, given by the trial court. This was as follows:

"You are further instructed that, under the law, the defendant was bound to furnish to the plaintiff a locomotive boiler, at the time in question, which was safe to be used, both as to the boiler and as to its appurtenances, and to keep and maintain the same in such condition at all times so as not to expose the plaintiff to any hazard or risk."

2. MASTER AND SERVANT: Federal Employers' Liability Act: "unsafe" locomotive.

It is urged that this instruction ig-

nored the question of negligence, and was contradictory to the other instructions given. It is true that the Federal Employers' Liability Act makes negligence the basis of the employer's liability. The trial court so instructed the jury. It is true, also, that such act and the Federal Safety Appliance Act enjoin certain specific duties upon the employer, a breach of which is declared to be unlawful and punishable. Such breach, therefore, constitutes negligence.

One of the Federal Safety Appliance Acts is generally known as the Locomotive Boiler Act. It was enacted February 17, 1911, as Chapter 103 of the Laws of 1911, and now appears as Sections 8630 to 8639 of the United States Compiled Statutes of 1916. It was later amended by an act passed on March 4, 1915, as Chapter 169, which now appears as Section 8639-a of such United States Compiled Statutes. In this act appears the following provision:

"Sec. 1. That Section two of the act, entitled 'An Act to promote the safety of employees and travelers upon railroads by compelling common carriers engaged in interstate commerce to equip their locomotives with safe and suitable boilers and appurtenances thereto,' approved February seventeenth, nineteen hundred and eleven, shall apply to and include the entire locomotive and tender and all parts and appurtenances thereof. (38 Stat. 1192.)"

"Sec. 2. That from and after the first of July, nineteen hundred and eleven, it shall be unlawful for any common carrier, its officers or agents, subject to this act to use any locomotive engine propelled by steam power in moving interstate or foreign traffic unless the boiler of said locomotive and appurtenances thereof are in proper condition and safe to operate in the service to which the same is put, that the same may be employed in the active service of such carrier in moving traffic without unnecessary peril to life or limb, and all boilers shall be inspected from time to time in accordance with the provisions of this act, and be able

to withstand such test or tests as may be prescribed in the rules and regulations hereinafter provided for. (36 Stat. 913.)"

The Employers' Liability Act, as enacted April 22, 1908, and later amended, now appears as Sections 8657 to 8665 of the United States Compiled Statutes of 1916. In this act appears the following:

"Sec. 1. Every common carrier by railroad while engaging in commerce between any of the several states or territories, or between any of the states and territories, or between the District of Columbia and any of the states or territories, or between the District of Columbia or any of the states or territories and any foreign nation or nations, shall be liable in damages to any person suffering injury while he is employed by such carrier in such commerce, or, in case of the death of such employee, to his or her personal representative, for the benefit of the surviving widow or husband and children of such employee; and, if none, then of such employee's parents; and, if none, then of the next of kin dependent upon such employee, for such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier, or by reason of any defect or insufficiency, due to its negligence, in its cars, engines, appliances, machinery, track, roadbed, works, boats, wharves or other equipment. (35 Stat. 65.)"

"Sec. 3. In all actions hereafter brought against any such common carrier by railroad under or by virtue of any of the provisions of this act to recover damages for personal injuries to an employee, or where such injuries have resulted in his death, the fact that the employee may have been guilty of contributory negligence shall not bar a recovery, but the damages shall be diminished by the jury in proportion to the amount of negligence attributable to such employee: Provided, That no such employee who may be injured or

killed shall be held to have been guilty of contributory negligence in any case where the violation by such common carrier of any statute enacted for the safety of employees contributed to the injury or death of such employee. (35 Stat. 66.)"

"Sec. 4. In any action brought against any common carrier under or by virtue of any of the provisions of this act to recover damages for injuries to, or the death of, any of its employees, such employee shall not be held to have assumed the risk of his employment in any case, where the violation by such common carrier of any statute enacted for the safety of employees contributed to the injury or death of such employee. (35 Stat. 66.)"

It will be noted that, by Section 2 of the Locomotive Boiler Act, it is made unlawful for a common carrier to use for interstate traffic a locomotive engine unless its boiler and its appurtenances are in proper condition and safe to operate in the service to which it is put. The question whether this provision of this statute imposes upon the carrier an absolute duty or only a duty to use care is not open to us. The Supreme Court of the United States has con-strued the Safety Appliance Acts as imposing upon the carrier an absolute duty, as distinguished from the qualified duty at common law to use due care. *St. Louis, I. M. & S. R. Co. v. Taylor,* 210 U. S. 281; *Chicago, B. & Q. R. Co. v. United States,* 220 U. S. 559; *Chicago, R. I. & P. R. Co. v. Brown,* 229 U. S. 317; *Delk v. St. Louis & S. F. R. Co.,* 220 U. S. 580.

In the first cited case, it is said:

"If the railroad does, in point of fact, use cars which do not comply with the standard, it violates the plain probibitions of the law, and there arises from that violation the liability to make compensation to one who is injured by it."

Conforming to these pronouncements, we held likewise in *Cook v. Union Pac. R. Co.*, 178 Iowa 1030.

It will be seen, therefore, that Instruction 9 of the trial court which is complained of was conformable to these Federal statutes, as construed by the highest court. The conflict between this instruction and the other instructions given on the subject of negligence is apparent, and not real. Where the wrong of defendant is predicated upon the breach of a penal statute, it is deemed negligence, as a matter of law. In such a case, it is quite immaterial whether the term "negligence" be used or not, for the purpose of submission to a jury.

III. One ground of reversal is assigned because the trial court withdrew from the jury the question of contributory negligence, and failed to submit to the jury the question of assumption of risk.

3. MASTER AND SERVANT: Federal Employers' Liability Act: withdrawal of assumption of risk and contributory negligence.

Under Section 3, the defense of contributory negligence is withdrawn in all cases where a violation of any Safety Act by the carrier contributed to the injury.

Under Section 4, the same withdrawal is made as to assumption of risk of employment.

Recognizing these provisions, appellant argues that the trial court had no right to assume the hypothesis that there had been a violation of the Safety Act, and that, therefore, instructions should have been given on these subjects. The argument is good as an abstract proposition only. Unless the plaintiff had a case as for violation of the Safety Act, he had none at all. Unless there was negligence in this regard on the part of the defendant which contributed to the injury as a proximate cause, there was no liability, and the jury must have so found, under the instructions of the court. This issue was made by the defendant's general denial. The plaintiff had to prove a violation of the Safety Act, or fail. But for that purpose, neither contributory negligence or as-

sumption of risk was an affirmative issue. It was an issue only in so far as it inhered in the general issue. This is not saying that it was not open to the defendant to prove, as it pleaded, that the negligence of the plaintiff was the sole cause of the injury. This proof would be admissible under the general issue. It would be only a method of disproving the allegations of plaintiff's petition. In such a case, the alleged negligence of plaintiff would be the sole negligence, and not contributory negligence.

There was no error in withholding these affirmative issues from the jury.

IV. Some complaints are directed to rulings on evidence. The plaintiff was permitted to testify that it was his duty to assist in remedying the difficulty on the occasion in question. Plaintiff was further permitted to testify as to the condition of his arm; that it was not yet in a condition that he could perform the duties of a fireman. The plaintiff's witness, Dr. Keyser, was permitted to testify, from an examination of the plaintiff's arm, that "he would have pain in using it to shovel coal today." Each item of this evidence was appropriately objected to. As to the first, the scope of duty of an employee is often more or less indefinite. In the absence of better evidence showing definite limitations upon the scope of duty, we see no reason why the employee himself may not testify thereto. As to the second and third items above set forth, we think the evidence was permissible. In the light of the evidence introduced by the defendant on the same subject, the evidence was not prejudicial, even if it had been erroneous. Dr. Nichols, testifying for the defendant, testified as follows:

**4. EVIDENCE:** best and secondary: scope of employment.

**5. EVIDENCE:** competency: non-expert: condition of injured limb.

"When I last attended him professionally, the arm was in a very good condition, and the union was complete.

I would expect that, in from six months to a year, the patient would regain normal use of the arm, and be free from pain. There is no absolute certainty about it. That is simply my opinion as to what the result ought to be, from my experience in treating similar cases. You have to take the patients' word for it as to whether they are or are not suffering pain."

The medical showing on both sides is practically identical. The fracture was compound. The muscles thereof had been lacerated. There was a good union of bone; but, according to the evidence, lacerated muscles take a long time for recovery, and, because of scarified tissue, seldom become wholly normal.

Lastly, complaint is directed to the size of the verdict. The trial court reduced it from $6,250 to $4,000. Defendant contends that it is still excessive. It is a large verdict. But the loss to the plaintiff has been very substantial, to say nothing of much suffering. The trial was had two years and a half after the accident. Up to that time, the plaintiff had not been able to resume the work of fireman,—at least, the jury could have so found. He was earning $125 per month. In the meantime, he has engaged in the insurance business, and has made up a substantial part of his loss. Defendant presents an estimate of what the actual loss of time amounts to, which is less than half of the amount allowed to stand. The estimate is too scant, even as to the loss of time. But, if we were to adopt it, we would still have the question of pain and suffering to consider, as well as future disability and discomfort. Upon the whole record, we reach the conclusion that we would not be justified in further interference with the amount of the verdict. The judgment below is, therefore,—*Affirmed.*

6. New trial: excessive verdicts: $4,000.

Ladd, C. J., Salinger and Stevens, JJ., concur.