## EHALT v. McCARTHY et al.

No. 6496.   Decided June 10, 1943.   (138 P. 2d 639.)

112

See 35 Am. Jur., 824; 39 C. J., Master and Servant, sec. 1171.

*Rawlings, Wallace & Black,* of Salt Lake City, for appellants.

*Van Cott, Riter & Farnsworth* and *E. C. Jensen,* all of Salt Lake City, for respondent.

WOLFE, Chief Justice.

The respondent was injured by a boiler explosion while engaged in interstate commerce as an employee of appellants. The trial resulted in a verdict of $20,000, from which this appeal was taken. While it is not required to refer specifically to the act or acts of Congress on which ■ the action against a carrier for breach of duty is predicated (*Cochran* v. *Atchison T. & S. F. R. Co.,* 109 Kan. 303, 198 P. 685) in this case counsel for the plaintiff at the threshold of the trial, in order to avoid the defense of contributory negligence, planted his complaint on the Boiler Inspection Act, Sec. 23, 45 U. S. C. A., rather than on Sec. 51 of the Title 45 generally known as the Federal Employers Liability Act.

The detailed facts as far as necessary to understand our decision are as follows: Plaintiff was a hostler's helper on duty in the yards of the Union Station with hostler Babcock. A hostler ordinarily takes charge of engines which are to be taken to and from the round house to the station or to and from the yard and services them. His helper corresponds to a fireman and on certain roads, of which the Denver & Rio Grande Western Railroad Co. is evidently one, also acts as a yard pilot doing the ground work. Babcock and Ehalt had operated as a team for a considerable length of time and, by arrangement between them Ehalt at times operated the engine under Babcock's supervision. The round house is situated at Burnham, a distance of approximately 2 miles from the Union Station at Denver, Colorado. Passenger train No. 16 arrived at 7:15 a. m. at the Union Depot on February 4, 1941, drawn by locomotive No. 1804. Babcock immediately boarded it but did not check the water

level in the boiler, although it was his duty to do so. Babcock sat alone in the engine cab for 13 minutes. At 7:28 a. m. Ehalt boarded it. He found Babcock in the fireman's seat on the left of the cab. Babcock said "Okeh, let her go," and respondent operated the engine, also without looking at the water gauge. He proceeded to run the engine northward over several tracks to 16th Street where it was coupled onto engine No. 1207 to which five cars were attached. This movement consumed about 15 minutes. After the coupling was made, about five more minutes were consumed at the station. At 7:45 after the Burlington Zepher arrived at the station, engine No. 1804, driven by Ehalt, started backing south pulling engine No. 1207 and the five cars. At 15th Street the men observed that the air brakes on engine No. 1207 were "sticking" and Babcock got off to release them. While Babcock was off the engine Ehalt looked into the fire box, found the fire low and "dry and no leaks or anything of that sort." He then started the stoker. The explosion occurred at 7:53 a. m., 25 minutes after Ehalt boarded the engine. He was thrown by the explosion and severely injured. The movement in the yard covered 6 to 8 blocks and took about 15 minutes. It was approximately $1\frac{3}{4}$ miles from the point where the engine and five cars were coupled to the point of the explosion. The grade was ascending and required the making of steam and increased draft. From marks on the inside of the boiler it was determined that at the time of the explosion the water was 36″ below the top of the crown sheet.

The Boiler Inspection Act reads as follows:

"23. Use of unsafe locomotives and appurtenances unlawful; inspection and tests. It shall be unlawful for any carrier to use or permit to be used on its line any locomotive unless said locomotive, its boiler, tender, and all parts and appurtenances thereof are in proper *condition and safe to operate* in the service to which the same are put, that the same may be employed in the active service of such carrier without unnecessary peril to life or limb, and unless said locomotive, its boiler, tender, and all parts and appurtenances thereof have been inspected from time to time in accordance with the provisions

of sections 28, 29, 30, and 32 of this title and are able to withstand such test or tests as may be prescribed in the rules and regulations hereinafter provided for." (Italics added.)

By planting his action on the above act, plaintiff was not embarrased by any defense of contributory negligence which could have been raised if the action had been founded on secs. 51 to 59 of 45 U. S. C. A., for the reason that the railroad is absolutely liable for injuries which are proximately caused by a failure to comply with the Boiler Inspection Act. *Chicago, Burlington & Quincy R. Co.* v. *Willard*, 220 U. S. 413, 31 S. Ct. 460, 55 L. Ed. 521, 61 L. Ed. 874; *Baltimore & Ohio Railroad Co.* v. *Groeger*, 266 U. S. 521, 45 S. Ct. 169, 69 L. Ed. 419.

The plaintiff contends that the defendants acting through their agents furnished plaintiff with locomotive No. 1804; that at the time of delivery the crown sheet of said locomotive was overheated due to low water, as result whereof the said locomotive (boiler) blew up; that the delivery by the employee of defendants to plaintiff of a boiler with the water at a low point (at the time of delivery alleged to be approximately 27″ below the crown sheet) showed that the carrier had permitted the use of a boiler which was not in a safe and proper condition for operation in the service to which it was assigned and unnecessarily dangerous to life and limb; that it thus failed to comply with the Boiler Inspection Act and is consequently absolutely liable; and that a boiler in such condition was itself a defective boiler.

The defendants contend (1) that their duty to plaintiff was discharged as far as the Boiler Inspection Act was concerned when he was furnished with a locomotive, the boiler, tender and all parts of which were mechanically in proper condition and sufficient and safe to operate; (2) that it is not liable when recovery is sought under that act for injuries which are due to the "negligent act of an employee in the use or misuse of an appliance safe and proper in itself and free from mechanical defect;" and (3) that the proximate and sole cause of this explosion was the act of

plaintiff in using the engine for nearly half an hour with the knowledge or easy means of knowledge that the water was out of sight in the gauge.

Until January 11th, 1943, the cases as far as we are able to discern held without exception that Safety Appliance Act, 45 U. S. C. A. § 1 et seq., and the Boiler Inspection Act, 45 U. S. C. A. § 22 et seq., were designed to impose absolute liability on the carrier only for mechanical defects, inadequacies or insufficiencies in equipment, apparatus or appliances.

The case of *Baltimore & Ohio Railroad* v. *Groeger,* supra, did not expressly hold that the Boiler Inspection Act was limited to mechanical defects, but held that the jury could (from the evidence of a witness who, at Foster Junction, a station at which not long before the explosion the engine had stopped, observed sizzling of water upon the fire and observed water and steam escaping from the boiler into the firebox and, on opening the firebox door, observed steam gushing out) infer that there was a defect in the boiler. That case has been, however, construed as holding that the Boiler Inspection Act limits the absolute liability of the railroad companies to accidents caused or contributed to by mechanical defects, inadequacies or insufficiencies in apparatus or equipment. *Watkins* v. *Boston & M. R. R.,* 83 N. H. 10, 138 A. 315.

The view taken in the case of *Harlan* v. *Wabash R. Co.,* 335 Mo. 414, 73 S. W. 2d 749 at page 752, represented the general thought in that regard. The court said:

"Defendant contends, and we think correctly so, that the facts proven do not show or constitute a violation of the Boiler Inspection Act, under our ruling in *Riley* v. *Wabash R. Co.,* 328 Mo. 910, 44 S. W. 2d 136, 139. The evidence here does not show any mechanical defect from use or originally in the engine or any appliance thereof. It was not a mechanical defect or any faulty construction to have a trapdoor in the floor of the engine cab for the purpose of affording access to the coal conveyor operating underneath the floor. Such was proper and necessary in case this mechanical stoker became clogged or needed adjustment or repair. The trapdoor was without

defect and operated safely in the way and for the purpose intended. It was intended to be closed when not in use and the engine became 'unsafe to operate in the service to which the same was put' only because of the negligent act of leaving the trapdoor open when it ought to have been closed. The Boiler Inspection Act (45 U. S. C. A. § 22 et seq.), like the Safety Appliance Act (45 U. S. C. A. § 1 et seq.), was not intended to cover the negligent act of an employee in the use or misuse of an appliance safe and proper in itself and free from mechanical defects."

The cases under the Boiler Inspection Act held that:

(a)    There was no liability when injury was caused by objects or obstructions placed by unknown persons. See *Reeves* v. *Chicago, St. Paul, M. & O. Ry. Co.*, 147 Minn. 114, 179 N. W. 689 (holding presence of coal upon a step leading to the locomotive cab did not entitle injured employee to recovery) ; *Slater* v. *Chicago, St. P., M. & O. R. Co.*, 146 Minn. 390, 178 N. W. 813 (holding no cause of action for injuries caused by ice bunker displaced by trespasser so it projected upon the running board) ; *Chicago, R. I. & P. R. Co.* v. *Benson,* 352 Ill. 195, 185 N. E. 244 (holding carrier not liable under Safety Appliance Act where some unknown person wrapped wire around a grab-iron) ; *O'Dea* v. *Byram,* 176 Minn. 67, 222 N. W. 519 (where the latch flopped forward onto a stub of the shaker suddenly arresting movement of handle bar causing a jerk and strain of the operator's neck. The flopping seemingly caused by particles of dirt lodging in the hinge of the latch preventing it from being turned entirely away from the position where it could arrest the stub. However, it would seem to have been a jury question as to whether the carrier failed to keep the journal of the latch free from grit) ; *Gerow* v. *Seaboard Airline Ry.*, 189 N. C. 813, 128 S. E. 345 (where the tank hose lacked a strainer in contravention of Rule 153 (a), I. C. C.).

(b)    On the principle that the Safety Appliance Act and the Boiler Inspection Acts reached only mechanical defects, inadequacies and insufficiencies no liability attached where the injury was caused by a slipping substance where the contrivance itself was not defective, see *Ford* v. *New York*

*N. H. & H. R. Co.*, 2 Cir., 54 F. 2d 342 (grease on locomotive grab-iron).

(c) And where the contrivance was mechanically in good order although it may have been so protruded as to constitute a danger it was generally held that it would preclude recovery under the Boiler Inspection Act. *Ford* v. *McAdoo*, 231 N. Y. 155, 131 N. E. 874; Contra see *Frye* v. *Chicago R. I. & P. Ry. Co.*, 157 Minn. 52, 195 N. W. 629, 196 N. W. 280.

(d) There was a fortiori no liability where the equipment or appliances were in good working order but the injury occurred because of faulty operation. See *Cochran* v. *Atchison, T. & S. F. R. Co.*, 109 Kan. 303, 198 P. 685, where it was stated

"The real question in the court below was whether the dropping of the crown sheet and the explosion which resulted was caused by a defective or insufficient condition of the crown sheet or was due *to the lack of water covering the sheet.*" (Italics added.) See, also, *Erie R. Co.* v. *Lindquist*, 3 Cir., 27 F. 2d 98; *Thornton* v. *Minneapolis & St. L. R. Co.*, 187 Iowa 1158, 175 N. W. 71 (where a valve was defective); *Harlan* v. *Wabash R. Co.*, supra; *O'Dea* v. *Byram*, supra. (Doubtful here whether failure of carrier to keep journal clean of grit could not itself be classed as a mechanical defect.)

On January 11, 1943, the Supreme Court of the United States handed down a decision in the case of *Lilly* v. *Grand Trunk Western R. Co.*, 317 U. S. 481, 63 S. Ct. 347, 252, 87 L. Ed. —. It holds that "there is no warrant in the language of the Act (Boiler Inspection Act) for construing it so narrowly" as to cover "only defects in construction or mechanical operation. In that case the petitioner fell to the ground by slipping on ice which had formed on a space of 6 square feet on the top of the tender between the water man hole and the fuel space upon which he was standing while attempting to draw toward him a water spout preparatory to filling the tender's tank with water. It was alleged that there was a crack which permitted the water to leak through "rendering it likely and liable for the water to freeze and cause a dangerous condition * * *." The jury found

that there was no leak—and therefore no mechanical defect —thus leaving the question one as to whether the Boiler Inspection Act was violated by the presence of ice on the tender's top. Whether regardless of the carrier's opportunity to prevent its accumulation or furnish means to defend against it does not appear in the opinion. The court said:

"The use of a tender, upon whose top an employee must go in the course of his duties, which is covered with ice seems to us to involve *unnecessary peril to life or limb*'—enough so as to permit a jury to find that the Boiler Inspection Act has been violated. Fortunately, we are not left wholly to our own resources in construing the Act in the light of its humanitarian purpose. The Interstate Commerce Commission has set the standard here by promulgating a rule (No. 153) that the 'Top of tender behind fuel space shall be kept clean and means provided to carry off waste water.' From the phrasing of Rule 153 we think it aimed at requiring the top of the tender to be kept free of foreign matter which would render footing insecure, for example, coal, dust, debris, grease, waste water, and ice. While the locomotive inspection rules are generally devoted to details of construction and specification of materials, at least one other rule deals with the condition of surfaces upon which employees must stand. In using the word 'clean' the Commission must have meant something more than mere manner of construction or mechanical operation because 'clean' does not naturally lend itself to such a limited connotation. That something more is the continuing duty of promoting the safety of employees by removing from the top of the tender all extraneous substances which might make standing there hazardous."

The Supreme Court could not have intended to imply that the Interstate Commerce Commission could, by the use of the word "clean" which does not apply to a "manner of construction," enlarge the limits of the Boiler Inspection Act beyond those intended by Congress.

While the Lilly case refused to limit the application of the Boiler Inspection Act to mechanical defects, inadequacies or insufficiencies in apparatus or equipment, it is not thought that it was intended to hold that the basis of the carrier's liability was other than a breach of a duty imposed by law. The opinion holds that the word "clean" used in Rule 153 (c) includes keeping the tender top free from ice. Whether the

Lilly opinion goes to the length of holding that if the ice formed on the tender top during the tour of duty of the person injured whose very duty or opportunity it might have been to keep the top clean we need not now determine. The facts are not set out in the opinion. In passing we can but observe that if the former were the case there would appear to be introduced into the statute law of carrier liability, a limited form of compensation—an obligation to pay regardless of fault. While such result might appear to be socially justifiable since the risk is incident to the work it is to be doubted whether the Lilly case intended such result. We must assume that the Lilly case was definitely bottomed on the carrier's breach of duty *to the injured employee* (and not a duty for which that employee was himself responsible) to keep the tender top free from ice.

At first blush it would appear that the Lilly case had definitely overruled the cases set out under categories (a) and (b) and perhaps (c) above. But here again on close reading the opinion appears to distinguish the cases above cited from the situation with which it dealt on the basis of Rule 153 (c). It states:

"Conditions other than mechanical imperfections can plainly render equipment unsafe to operate without necessary peril to life or limb. Whatever else may be said about the cases relied on by respondent, [all included in cases cited under categories (a), (b), (c), and (d) above] they are sufficiently distinguishable in that they either did not involve or did not consider Rule 153 or any comparable regulation."

The argument is now made that the Lilly case, having broken through the line of cases which held that, in order to establish liability under the Boiler Inspection Act, the engine must be proved mechanically defective, all that need be shown is that an engine was, when the plaintiff boarded it, "unnecessarily dangerous to life and limb" and that the water being in the instant case below the level of the lowest reading of the gauge, when Babcock and Ehalt boarded her, it transpires that the carrier used or "permitted to be used

on its line" a boiler not in condition and safe to operate without unnecessary peril to life and limb; that having done so and the boiler exploding as the proximate result of such permitted use, the carrier is absolutely liable; that it is not permitted to introduce the plaintiff's alleged contributory negligence before the jury in order that it might assess relative fault.

We do not think, however, that the Lilly case was intended to cover a situation like that existing in this case. As previously noted the Lilly case rests, at least in part, on a rule which required that the tender top behind the fuel space be kept free from ice. Thus the carrier permitted an engine to be used which did not meet with one of the safety requirements of the Interstate Commerce Commission. Respondent would undoubtedly here contend that an engine, as in this case, might be far more dangerous by reason of a condition not covered by any requirement of the Interstate Commerce Commission than it would be by the omission of a duty required by that agency. Admittedly that is true, but we do not believe that it was within the contemplation of the Boiler Inspection Act to include an engine whose dangerous condition was itself due only to the failure of those charged with operating the engine to so attend to the very fundamental duty of supplying the water needed to run the engine. The Lilly case does not go so far and we do not think it has such implication.

As before stated the basis of the carrier's liability must be a breach of duty. In the Lilly case its failure to keep the tender deck free from ice was a breach of duty which made the engine in itself unsafe for use and when injury occurred as the proximate result of such breach of duty the carrier was absolutely liable. Ordinarily where the common law rule is modified to impose a rule of absolute duty on the employer to provide a safe place to work or safe tools in place of the duty to use reasonable care to do so, we may expect that it is because the employer has the sole, or at least greatly advantaged, opportunity to discover and remedy defects and

because the employee comes innocently to the tools and place of work and must ordinarily accept them as provided without cavil—for that matter, without opportunity to protest where defects are hidden. The very fact that the law visits upon the carrier absolute liability in cases of injuries resulting from a violation of the Boiler Inspection and Safety Appliance Acts, withdrawing from the carrier the right to interpose contributory negligence even for the purpose of appraising comparative blame, is strongly indicative of a purpose to limit the type of breach of duty on which such liability is based to such as lie outside of delicts involved in the actual operation.

In general it can be said that Chapter 1 of Title 45, U. S. C. A. dealing with safety appliances and equipment, and which includes Sec. 23, the so-called Boiler Inspection Act, was designed to fasten upon the carrier the positive duty, regardless of negligence, to provide safe and adequate appliances and equipment. On the other hand, Chapter 2 of Title 45, U. S. C. A. and especially Sec. 51 thereof, generally known as the Federal Employers' Liability Act, deals with liability for negligence. It makes negligence the basis of the action. "Defects or insufficiency * * * in its * * * engines, appliances" must be "due to its negligence" to recover under Sec. 51 and under Sec. 53 damages may be diminished by reason of contributory negligence. The Boiler Inspection Act was passed in 1911; the Employers'. Liability Act in 1906. The positive duties laid out in Chapter 1 pertain to mechanical defects, inadequacies or insufficiencies in safety equipment and devices, faults in design, in type or manner of construction or defects allowed to occur through wear and tear, damage or neglect, and now perhaps under the holding of the Lilly case, to substances added by nature or man, not a part of the equipment, but which make the equipment potentially unsafe and certainly if a breach of a standard laid down by the I. C. C. if the action of the latter is within the scope of the Boiler Inspection Act.

We do not think that the Boiler Inspection Act was designed to extend the absolute liability of a carrier to those situations where the danger arises by reason of improper operation or is caused by neglect in the very dynamic processes of operation. This latter must be distinguished ■ from those situations where the condition arises out of a danger which inheres in or adheres to the equipment itself, such danger resulting from mechanical defects or because of matter added or subtracted by nature or by man. In such latter type of cases the equipment is only potentially dangerous. It takes an actor to come onto the stage thus set. The carrier has the duty to supervise and inspect and to see that such equipment is not permitted to be used on its line in active service until the potential danger is removed.

It seems quite probable that one of the purposes Congress had in mind in passing the Boiler Inspection Act was to stimulate the improvement in design of locomotives and to devise continually new and safer apparatus such as, for example, would prevent ice from forming on platforms where men were required to go. Such purpose may have been recognized in the Lilly case. But no amount of invention will take the place of an operator's failure to attend to his duty of properly operating the equipment. Invention will reduce or eliminate the hazard of those things which are potentially dangerous in the sense that they statically await the actor's entry and his placing himself in a situation as to bring their potentialities into play.

Admittedly a positive duty is imposed on the carrier not to use or *permit* to be used on its line locomotives which are not in proper condition or safe to operate and this duty does not depend on whether the carrier has been negligent. Be it ever so careful it is liable if it permits an unsafe ■ engine to be used on its line. And, say respondents, a low watered engine is an unsafe engine so that to permit such engine to be used by Ehalt spelt liability regardless of his negligence which cannot be set up. But such literal ap-

plication of language would make the carrier liable for injuries to an operating crew which started out with a full boiler and negligently allowed the water to get so low as to cause an explosion. The carrier would be required to send along a watcher with every engine in order to fulfill a duty spelt from such a literal application of the language not to "permit to be used on its line" such an unsafe locomotive. And even the defense of negligence of the crew in the very performance of their duty to keep water in the boiler would be denied the carrier. This absurd result is noted only for the purpose of demonstrating that the language of the act is susceptible of interpretation in order to arrive at the intent of Congress. The question of what type of unsafe engines and the extent to which the absolute liability goes is still open for determination. The fact that the act requires inspection from time to time lends support to the view that the Boiler Inspection Act is tied into defects or at the most with such conditions of potential danger as were dealt with in the Lilly case, i. e., foreign matter which may be considered as a part or attribute of the locomotive and not a locomotive dangerous because of neglience in its actual operation.

In the instant case the very substance—water—which furnishes motive power for the locomotive when heat is continually applied, without replenishment, changes that locomotive from a beneficient instrument of commerce to a menace to life and limb. But that is entirely accomplished by the working of the engine together with inattention or neglect of the crew in charge and not by any defect, mechanical or otherwise, that inheres in or adheres to the apparatus or mechanism supplied. In such former case the danger inheres in the operational processes and not in the equipment. A defect or danger inherent in the equipment, whether it be a mechanical defect or added substance, becomes an element or attribute of that equipment. The Boiler Inspection Act was not meant to reach beyond such defects. The situation in the instant case was not comprehended by the Boiler Inspection Act nor did the Lilly case intend to so extend that Act to such situation.

Fundamentally the correct solution of this case does not turn on the conduct of Babcock or of Ehalt after taking charge of the engine but on the very nature of the danger which was created. A danger created by the non-attention or neglect incident to operation which does not produce an engine defective in itself constitutes the basis for an action, not under the Boiler Inspection Act, but under other Sections of Title 45. If in this case the boiler had blown up immediately upon advent of Babcock and Ehalt, or so soon afterward that they would not have had a reasonable time to pull the fire, the action would likewise have had to be planted on the carrier's breach of duty in the negligence of permitting the water to get too low and not on a breach of the duties imposed by the Boiler Inspection Act. The danger being one incidental to operation rather than one which becomes an attribute of an engine so as to make it unnecessarily perilous to life and limb, as meant by the Boiler Inspection Act, the action would have to be brought under the Federal Employers' Liability Act.

The attempt of plaintiff to escape from presenting his conduct to the jury for appraisal by planting his action on the Boiler Inspection Act, while ingenious and resourceful, cannot be permitted. The very conduct of Ehalt conjoined to that of the predecessor crew seems aptly to illustrate the sort of case which Congress intended should be brought under the Employers' Liability Act so as to permit the relative appraisal of negligences.

Giving full effect to plaintiff's computation which reached a result that the water was 27″ below the crown sheet at the time the engine was delivered it was still 3″ above the point where the syphons would no longer throw the water over the crown sheet. By tests with a similar locomotive on the day following the accident it took 760 gallons of water to perform the work done by plaintiff and his hostler from the time they received the engine to the time of the explosion. They ran the engine nearly one-half hour after they received it. There was ample and reasonable time to draw

the fire. During this time, the water got below the level where the syphon could no longer dash it on the crown sheet and thus caused the same to buckle with heat and tear away from its moorings, permitting sudden release of pressure and consequent sudden expansion of newly formed steam which blew out the boiler and caused serious injuries.

The law did not intend to take away the defense of contributory negligence in this type of case. The danger to which the plaintiff had himself contributed to obtain the dire result was created by a fellow employee through negligence which occurred not only in the course of operation but as a part of the operation and inherent in it and which made that sort of operation dangerous rather than making the apparatus itself a potentially dangerous instrument. In the case of low watered engine left with fire under it, the injury does not depend upon one's action articulating with a lurking condition potentially dangerous which such action makes operative.

Appellant contends that the conduct of Ehalt who had actual charge of operations in not observing the gauge and running the engine for nearly a half hour partly up grade drawing one engine and five cars and refueling in the interval, was an independent intervening cause which must be considered in law the sole cause of the explosion. This contention is not tenable. The conduct of Babcock and Ehalt—and the latter when he assumed Babcock's position by understanding between them also assumed his duties if in fact he did not have an independent duty to watch the gauge—in neglecting to attend to the water in the boiler was simply a continuation of the conduct of the predecessor crew. It was an added and continued negligence of the same type and not an independent nor an intervening cause. The whole conduct of predecessor and successor crews was of a piece. An independent intervening agent such as to break the causal connection between right and wrong according to Bohlen on Torts, page 29, must be (1) independent, self created, not itself the product of the wrongful act; (2) it

must intervene; (3) "It must divert and not merely hasten natural effect of the wrong." Judge Sanborn in *Union Pac. R. Co.* v. *Callaghan*, 8 Cir., 56 F. 988, 989, at page 993, very clearly lays down the definition of an independent intervening cause. He says:

"The independent intervening cause that will prevent a recovery on account of the act or omission of a wrongdoer must be a cause which interrupts the natural sequence of events, turns aside their course, prevents the natural and probable result of the original act or omission, and produces a different result, that could not have been reasonably anticipated. The concurrent or succeeding negligence of a fellow servant or a third person which does not break the sequence of events is not such a cause, and constitutes no defense for the original wrongdoer, although, in the absence of the concurrent or succeeding negligence, the accident would not have happened. *Martin* v. [North Star] *Iron Works*, 31 Minn. 407, 410, 18 N. W. 109; *Burrows* v. *Coke Co.*, L. R. 5 Exch. 67; *Ricker* v. *Freeman*, 50 N. H. 420 [9 Am. Rep. 267]."

The appellants object to instruction No. 6 which told the jury that if the predecessor crew on engine No. 1804 had permitted the water to become so low as to make the engine unsafe it was negligence and such negligence was attributable to the appellants. On the theory of the plaintiff this was a correct instruction. The break in plaintiff's case does not come in the failure to prove negligence of the predecessor crew but in the conception that under the evidence the explosion was proximately caused by a violation of the Boiler Inspection Act.

The appellants complain of instruction No. 10 which they claim authorized a quotient verdict. Except for the guidance of the court in retrying the case it is unnecessary to decide this point. A verdict arrived at by chance will be set aside. Where the jurors agree to abide by an amount ▮▮▮ arrived at by adding the amounts which the individual jurors think plaintiff is entitled to and divide by the number of jurors, the verdict is said to have been arrived at by chance. In reality chance is not the basis of such a verdict because each juror has arrived at his sum by his own judg-

ment. The quotient represents the mean of all their judgments. However, in *Wright* v. *Union Pacific R. Co.*, 22 Utah 338, 62 P. 317; *Lambourne* v. *Haflin*, 23 Utah 489, 65 P. 206, and *Pence* v. *California Mining Co.*, 27 Utah 378, 75 P. 934, an agreement to abide by the quotient verdict was condemned but where the jury used the quotient as a new basis for discussion, and there was no agreement to take it as final, the verdict was not set aside. The real reason why quotient verdicts are taboo is not that they are based on chance but that they result in the jury not arriving at a verdict of the amount granted by comparing and discussing the relative amounts which each juror thinks should be granted, and by such deliberations arriving at a just verdict. Each juror should be encouraged to compare individual judgments and in the light of the reasons given by each in support of such amounts, revise his own judgments and in the end arrive at a considered and deliberated verdict. Agreeing to abide by the total of individual judgments divided by the number of jurors results in the omission of this mental process. That is the real reason for condemning the process. Where it is apparent that the quotient was made the basis for further deliberation the verdict will not be set aside. But not to set aside a verdict because the road remained open for further deliberation, and for the court to encourage by an instruction any process which tends to cut down the very consultation, deliberation and comparison of judgment, which is one of the very important reasons for having more than one individual on the jury, are two different matters.

True, in this case, the court did restrict the jury in part as follows:

" 'This is a scheme of chance, and no element of chance may enter into your verdict or into the determination of any question necessary thereto; but if you find honest differences of opinions existing in your ranks, you may add up the various amounts to which you severally believe the plaintiff is entitled and divide so as to arrive at an average of your differences; and after you have arrived at such an average, you may use that average as a basis for further determination, provided you have not agreed in advance that the figure arrived at is to be your verdict.' "

While we are not prepared to say that we could have reversed this case because of the giving of this instruction had this been the only question raised, we do not commend the instruction. The court should not put ■ in the minds of the jurymen guides which short cut full discussion of comparative judgments. In the case of *International & G. N. R. Co.* v. *Lane,* Tex. Civ. App., 127 S. W. 1066, it was said

"the plan adopted by the jury (where there was no agreement prior to the addition and division) in arriving at a verdict is not to be commended."

In *Kansas City R. Co.* v. *Ryan,* 49 Kan. 1, 30 P. 108, 110, the court said,

"Although a court might be justified in refusing to set aside a verdict made upon the average theory, it does not follow that a court would be authorized to suggest such mode by instruction." See, also, *West Chicago St. R.* v. *Dougherty,* 89 Ill. App. 362.

On the basis of this opinion the decision is that the judgment be reversed and a new trial granted, the appellants to recover costs. Such is the order.

LARSON, MOFFAT, and McDONOUGH, JJ., and CLARENCE E. BAKER, District Judge, concur.

PRATT, J., on leave of absence.