260 P.2d 682

**BOARD OF COM'RS OF DONA ANA COUNTY v. GARDNER.**

**No. 5519.**

Supreme Court of New Mexico.

June 15, 1953.

W. C. Whatley, W. B. Darden and LaFel E. Oman, Las Cruces, for appellant.

T. K. Campbell and James A. Landon, Las Cruces, for appellee.

COORS, Justice.

The Board of County Commissioners of Dona Ana County, appellee herein, instituted a condemnation proceeding against the

appellant and others for highway purposes. By such proceeding it took from the appellant on November 18, 1948, some 88.805 acres of grazing lands in the form of a 150-foot strip of highway right-of-way that extends through appellant's property for a distance of between four and five miles. Three commissioners were appointed as provided by law to appraise the lands. Appellant and other defendants filed exceptions to the commissioners' report. The case thereafter came up for trial before the district court and a jury on September 20, 1951.

The jury returned a verdict wherein it assessed the fair market value of the lands taken from appellant as of November 18, 1948, at $7.92 per acre, assessed the fair value of the damages to the lands not taken at $2,676, and assessed the fair·value of benefits to the land of appellant not taken at $6,791. On the basis of these jury findings the Court entered its judgment awarding appellants $703.34 for the land actually taken but awarding nothing for damages to the remaining lands. The Court thus offset the benefits against the consequential damages to the remaining lands, thereby cancelling out these consequential damages completely, but did not set off the benefits against the value of the lands actually taken.

It was appellant's contention in seeking a judgment non obstante veredicto, or a new trial, and it appears to be his contention now, that the judgment entered should have been for $3,379.34, that being the sum of the $2,676 assessed by the jury as the fair value of the damages to the remaining lands of the appellant plus the $703.34 representing the acreage actually taken. It is appellant's contention, in other words, that the figure arrived at for the benefits should not be considered by the Court in its calculation, either because this element had already been considered by the jury in assessing the damages of $2,676 and that this further calculation meant that it was being considered twice, or secondly, that the benefits should not be considered at all under the New Mexico constitutional and statutory provisions providing for just compensation in condemnation proceedings. It is also appellant's contention that the instructions to the jury were conflicting on material facts, that assessment of the benefits at $6,791 was not supported by substantial evidence, and further that the jury's verdict was a quotient verdict which does not reflect the judgment and consideration of the jury and that, therefore, it should not be permitted to stand.

Appellant urges that when lands are condemned in New Mexico it is not proper in determining consequential damages to set off against such damages the benefits which may accrue to the landowner's remaining land; and that, as a general proposition, the taking will result in injury to

the landowner not only because of the property actually taken, but also because the usefulness to him of the remaining land is thereby reduced, and that he should, therefore, be reimbursed for both elements of damage although the public purpose for which part of the land is condemned may also incidentally result in some special and general benefits to the landowner.

■ By general benefits are meant those benefits which the adjoining landowner shares in common with the public generally. By special benefits we mean those benefits resulting from a public work which enhance the value of the land not taken because of their advantageous relation to the improvement. For further definition see Beveridge v. Lewis, 1902, 137 Cal. 619, 67 P. 1040, 70 P. 1083, 59 L.R.A. 581; Brand v. Union Elevated R.R., 1913, 258 Ill. 133, 101 N.E. 247, L.R.A.1918A, 878; Mantorville R. & T. Co. v. Slingerland, 1907, 101 Minn. 488, 112 N.W. 1033, 11 L.R.A.,N.S., 277. When such incidental benefits exist the distinctions which may be drawn between the two factors, benefit and injury, have been variously combined by the courts. Lewis, in Volume 2 of his treatise on Eminent Domain (3d ed. 1918) at page 1177, groups their treatment by the courts into five main classifications: (1) that the benefits cannot be considered at all (this apparently is the rule contended for here by the appellant though at one point in the brief in chief the argument appears to intimate that benefit may be considered in determining fair market value, but that it has in fact been considered twice); (2) that special benefits may be set off against damages to the remainder but not against the value of the part taken (this is the result reached by the trial court in the instant case); (3) that benefits, whether general or special, may be set off only against the damages to the remainder; (4) that special benefits may be set off against both damages to the remainder and the value of the part taken; and (5) that both special and general benefits may be set off against damages to the remainder and the value of the part taken.

We believe the fifth rule is correct and in accordance therewith we hold that benefits, both general and special, should be set off against damages to the remainder and against the part taken.

Article II, Section 20 of the New Mexico Constitution provides:

"(Eminent domain.)—Private property shall not be taken or damaged for public use without just compensation."

Section 25-909, New Mexico Statutes Annotated, 1941 Comp., so far as pertinent here, provides for determining the amount of compensation and damages in the following language:

"For the purposes of assessing compensation and damages, the right

thereto shall be deemed to have accrued at the date of the notice, and its actual value at that date, shall be the measure of compensation of all property to be actually taken, and also the basis of damages to property not actually taken but injuriously affected, and in all cases where such damages are legally recoverable. * * *"

█ No express mention is made in these provisions of benefits that may accrue to the landowner and their treatment in determining the award. It should be noted, however, that Article 2, Section 20, New Mexico Constitution, speaks of "just" compensation. This can only mean that the framers of the Constitution meant that a fair and reasonable amount of compensation should be awarded. It follows that the compensation must be fair and just to both sides, for how else can "fair market value" be determined than by weighing the one against the other? As observed in 29 C.J.S., Eminent Domain, § 179, p. 1061:

"Where the constitution contains no provision in regard to the deduction benefits, it is competent for the legislature to provide that, where only a part of a tract is taken for the public use, the benefits accruing to the residue shall be set off against the damages thereto, or for the courts to allow such deduction, although there is some authority to the contrary. * * *"

█ The North Carolina court, though proceeding under an eminent domain statute which expressly provided that both special and general benefits should be considered as offsets against damages, enunciated the correct fundamental principle when it said:

"* * * All the landowner can claim is that his property shall not be taken for public use without compensation. Compensation is had when the balance is struck between the damages and the benefits conferred on him by the act complained of. To that and that alone he has a constitutional and vested right. * * *" Wade v. State Highway Commission, 1924, 188 N.C. 210, 124 S.E. 193.

We believe this is the rule as it applies in the case before us, though no attempt is here made to consider general benefits nor to charge off any of the special benefits against the property which was actually taken, these questions not being raised below or on appeal.

The trend throughout the nation is toward considering *all* benefits in the determination of damages in condemnation cases. This trend is nurtured by the policy of the state in trying to bring down excessive costs of rights-of-way so as to make the money appropriated and available for roads and other public improvements go as far as possible. It is possibly due also to

some extent to a gradually changing concept of the sacred character of real property ownership which thus gradually is altering the basic theory of "just compensation" in condemnation cases. Our holding in Board of County Commissioners of Santa Fe County v. Slaughter, 1945, 49 N.M. 141, 158 P.2d 859, 860 is in complete accord with these modern trends, wherein we said:

"The general rule for arriving at just compensation for property not taken but adversely affected is the so-called 'before and after' rule; and this poses the question: What was the value before the taking; and what is now the market value after the taking? The owner of the property, ordinarily, is entitled to receive the difference between these sums. * * *"

It would appear as obvious that if because of the taking any benefits accrue to the remaining land, the market value thereof is correspondingly affected and is thereby increased. Consequently, the benefit derived becomes a factor to be considered in determining any consequential damages to be awarded. As stated in 145 A.L.R. 7, at page 17:

"* * * the compensation must be just, not merely to the individual whose property is taken, but to the public which is to pay for it, or * * * it is to be measured by the loss caused to the owner by the appropriation, and * * * he is entitled to receive the value of what he has been deprived of, and no more, because to award him less would be unjust to him; to award him more would be unjust to the public. * *

 It appears to be conceded by the parties that the benefits sought to be considered in determining the fair market value *in this case are special in character,* and that the question of whether general benefits must be taken into account as an offset was not presented nor decided. Deduction or disallowance of compensation for special benefits accruing to the remaining land was justified on the theory that the value of the remaining property contiguous to the public improvements, such as a highway, was substantially increased.

Naturally, this increased value may be taken into consideration later in the increased value for purposes of sale. It is "market value" which determines whether and how much damage has resulted to the landowner through the taking.

 The court as a ministry of justice must see that the individual is afforded his constitutional rights in obtaining just compensation, but it must at the same time protect the public against exorbitant prices. "Fair market value" which includes in its determination all relative elements of injury and benefit received by the landowner has traditionally been considered as the most satisfactory basis. Dolan, Present Day Court Practice in Condemnation Suits,

31 Va.L.Rev. 9, 13 (1944). Fair market value is theoretically what a willing seller would take and a willing buyer offer. Because a willing seller is usually lacking in condemnation cases, however, the court has a special responsibility for seeing that the seller receives what is honestly due him; at the same time, it has the duty of making sure that under the pressure of compulsion the seller does not gouge the public for more than his property is reasonably worth. If there is no depreciation in the fair market value as a result of the taking of a portion there is no damage. Blair v. City of Charleston, 1896, 43 W.Va. 62, 26 S.E. 341, 35 L.R.A. 852.

█ It is our view that Section 25-909 contemplates that benefits accruing to the remaining lands of the landowner shall be considered in determining the damages sustained by the condemnee, for the value of the part taken as well as any damages to the part remaining, and we so hold. See our opinion filed simultaneously herewith in City of Tucumcari v. Magnolia Petroleum Co., 57 N.M. 392, 259 P.2d 351.

The next point to be considered is whether the instructions in this case are conflicting, contradictory, misleading or confusing to such an extent that the jury was confused in resolving a problem to which their attention had been directed, so as to prejudice the interests of the appellant.

Instruction No. 12 enumerates a number of elements of consequential damages which may be taken into account in determining market value of the lands not taken. It reads:

"In determining the fair value of the damages to the lands of the defendants Gardner and Tallman, not actually taken, you must determine the difference in the fair market value of the remainder of his lands immediately before and after the taking on November 18, 1948. You may and should, in arriving at this difference, consider the character and quality of the lands not taken, the situation of the part taken with reference to the residue, the effect of the severance of the tract taken from the residue, and the loss of value to the residue from the loss of the availability for use of the part taken."

Instruction No. 15, to which appellant's complaint is principally directed, reads as follows:

"If you find that the property of Mr. Tallman or Mr. Gardner, other than that property which was condemned, was enhanced in market value because of special benefits accruing to Mr. Tallman or Mr. Gardner, you are then to offset the enhancement or increase in market value of such other lands against any damages due to the arroyo or to the necessity of building fences which Mr. Tallman or Mr. Gardner

may have suffered due to the construction of the highway."

■ The latter instruction obviously contemplates that the jury shall assess certain additional elements of injury in determining the total damage done on the one hand and likewise to assess all special elements of benefit on the other. Then, after having done so, the benefits are to be offset against the sum of all the elements of injury. Instruction No. 15 supplements but does not contradict what appears in Instruction No. 12. A mere defect or omission in one instruction may be cured by another instruction. 18 Am.Jur., Eminent Domain, § 363, page 1005, and cases there cited.

The basis for confusion, if any really exists, is not between the two instructions but between these instructions and paragraphs 9 and 10 of the form of verdict which were submitted to the jury in these words:

> "9. We assess the fair value of damages to the lands of R. A. Gardner and wife, not taken in November, 1948, at $* * *.
>
> "10. We assess the fair value of the benefits to the lands of R. A. Gardner and wife, not taken in November, 1948, at $* * *."

■ The instructions contemplate that the jury take one step more than they are called upon to take by this form of verdict; namely, to offset the sum of the elements of special benefits against the elements of damages resulting to the lands not taken, which after the steps required by the form of verdict have been taken amounts to no more than a routine mathematical calculation. Any uncertainty which this difference between the instructions and the form of verdict may have temporarily created in any juror's mind, however, is cleared up by the incisive language in the form of verdict. In light of the impelling force of the form of verdict we cannot presume that a jury would not understand that at paragraph 9 the sum of the elements of damages resulting to the lands not taken was to be inserted without considering any of the benefits and that at paragraph 10, the sum of the items of special benefit to the lands not taken was to be supplied without regard to any elements of damage. Viewed in this light, the Court's Instruction No. 12, though admittedly it might have been better phrased, in effect did no more than instruct the jury to determine the fair market value of the portion of the lands not taken as that value stood before the taking and with that as its starting point to consider various elements of damage in determining ultimately the total amount of damage suffered as a result of the condemnation. Instruction No. 15 in the same manner advised the jury to evaluate any special benefits resulting to the land and to consider two additional possible elements of damage.

Appellant concedes that if the trial court had disregarded the finding as to benefits he could not have been hurt by these instructions. As we have already determined, however, that under New Mexico law in arriving at the market value before and after, benefits, both general and special, must be taken into account, the Court might, in instructing the jury concerning the assessment of the consequential damages as a medium for ascertaining the market value after the taking, have asked them to decide (1) whether the benefits accruing to the remaining lands exceeded the total damages suffered and, if so found, to allow no consequential damages for the lands not taken or the land taken; or (2) whether the damages exceeded the benefits, and in that event, by what sum, so that that figure might be used in reducing the market value after the taking. Since the benefits cancelled the damages out completely, appellant here has not been prejudicially damaged by a somewhat inept instruction or by the variance between the instructions and the form of verdict given to the jury.

Under the facts and circumstances of the case, therefore, we cannot say that appellants have succeeded in establishing a case for reversal or new trial on basis of the instructions given.

Appellant's third point urged as a basis for reversal or new trial is that substantial evidence is lacking for the jury's determination that the benefits assessed to appellant's remaining land amounted to $6,791. Appellant is correct in his assertion that the record nowhere discloses testimony or other evidence which supports either this or any specific figure upon which the jury's determination of the benefits can be based.

There appears to be ample testimony, however, that appellant's land before the taking had little value, except perhaps for its open air and sunshine.

The witness, Ben Hall, testified on direct examination:

"Q. Now I will ask you, in 1948 what was the fair or marketable or reasonable market value of land in that vicinity, such as you owned there? A. Well, I didn't really consider it having any value at that time.

"Q. Do you mean it was so high in value or so low in value? A. So low in value that I didn't consider it worth anything at that time.

"Q. And you say that Rix and Gardner's land is just about the same as yours? A. More or less."

Examination of the witness, W. G. Smith, one of the three commissioners who appraised the land, includes the following testimony:

"Q. Now describe the type of land that you viewed, belonging to Gardner, Graham and Rix. A. Well it was mesa land, such as we have in this part

of the State, with sandy type soil, not too much vegetation on it. * * *

"Q. At that time did you place a value on that land? A. Well we did after we talked it over; as I remember the three of us differed on it individually, but we did arrive at a value on that land.

"Q. What did you place that at? A. I think it was five dollars an acre, —I am not sure."

Examination of the witness, Delmer C. Bennett, produced the following:

"Q. Would you say that by reason of that highway that land had been benefited in any way? A. I would say extremely so, yes sir.

"Q. What benefits did they derive from that highway, Mr. Bennett? A. Well, for one thing, in case anybody would ever have an idea of building up on that mesa—there is a magnificent view, that is about all you can say. Outside of that I don't think there would be any commercial value; * *"

And on the cross-examination of Mr. Bennett, the record discloses this:

"Q. You know the Gardner land? A. Yes, I do.

"Q. Do you think that would grow grass and trees? A. Possibly if it had enough water it might, and if you moved the dirt up there.

"Q. There is considerable dirt up there, isn't there? A. Dead dirt, yes sir. * * *

"Q. Would you say that is soil all the way down? A. Do you mean dirt soil. It is sand.

"Q. It grows mesquite, doesn't it? A. Yes sir."

Mr. Charles P. Rowland, the county road superintendent, on cross-examination, contributed answers concerning the lands in the area, as follows:

"Q. And now you speak of these other lands being mesa lands, describe in detail to the jury the type of land that is on the mesa where this highway runs through? A. The way I see it, it is the type of land which is just sand hills, mesquite.

"Q. Is there any grass of any sort? A. I haven't seen any; the jack rabbits that run across there take their water bottles and lunch with them."

There is further testimony along these lines, all of which is reminiscent of the jingle by the desert bard who sang:

"There is a land of dusty roads,
 Of weeds and snakes and horny toads,
 It never rains, it never snows,
 The sand and wind, it always blows,
 And how we live, God only knows."

The jurymen, too, were residents of the area and were familiar with the general terrain and climatic conditions of

the region. They were taken to view the particular land in question and are permitted under the law to use their knowledge gained by such a view, not only to interpret the evidence offered in the case, but also as independent evidence of the facts as these appeared to them individually on the view. People v. Al. G. Smith Co., 1948, 86 Cal.App.2d 308, 194 P.2d 750. It is upon this combination of the evidence that the damages were ascertained.

 The jury in awarding $7.92 per acre for the land actually taken and the court, though awarding no consequential damages for the injury to appellant's remaining lands, its dusty trails, its mesquite, its winds and sands, in failing to offset benefits against the lands actually taken, were more than fair to these appellants, Mr. Gardner and his wife.

It may even be conceded that the evidence as to any specific amount of benefits is non-existent and, for that reason cannot be substantial, but evidence that the benefits outweighed the damages suffered to the remaining lands is considerable and therefore adequate. Since the court in its judgment did not permit the specific amount of benefits in dollars and cents found by the jury to outweigh the amount of damages found, but simply awarded nothing for damages to the remaining land, it merely reflects the fact therein that the benefits outweighed the damages, and as to that fact

there is substantial evidence. Hence, the error, if any, as to the specific figure or benefits received, is immaterial.

We, therefore, hold that the verdict which disallows any consequential damages is reasonably supported by sufficient evidence and will not be disturbed for lack of substantial evidence on this appeal. Flippo v. Martin, 1948, 52 N.M. 402, 200 P.2d 366; Talley v. Greear, 1928, 34 N.M. 26, 275 P. 378.

Probably most serious challenge to the judgment in this case rests in the appellant's fourth and final argument. This is the contention that the judgment of the jury was based upon a quotient verdict. As to the element of consequential damages the argument has been weakened by our determination that under the facts of this case, a precise figure in dollars and cents was immaterial since only the finding that benefits exceeded damages was essential. But as to the assessment of damages for the lands actually taken, at least, the matter requires further consideration.

 In assessing a quantum of damages, unless the only evidence before a jury is one, and one specific figure only, it would be most unlikely, yes, virtually impossible for each juror to settle upon one and the same figure in the first instance as the precise amount of damage suffered. Particularly is this so when figures are not mentioned by any of the witnesses, but

when their testimony is couched in general terms. Of necessity some scheme for reaching a figure upon which all agree as just and fair under the circumstances must be employed. One of the methods used by jurors for bringing themselves together is the process of addition and division. That, by itself, is not improper and does not brand the result as a quotient verdict. The vice which makes the arrangement improper is an agreement in advance by these jurors to accept one-twelfth of the aggregate amount of their several estimates as their verdict, without subsequent reconsideration. Wilson v. Berryman, 1855, 5 Cal. 45, 63 Am.Dec. 78; City of Ottawa v. Gilliland, 1901, 63 Kan. 165, 65 P. 252, 88 Am.St.Rep. 232; Kirby Lumber Co. v. Consolidated Underwriters, Tex.Civ.App., 1926, 289 S.W. 134. This court observed in Talley v. Greear, supra:

"To add the several sums which each juror thinks in conscience ought to be given and divide the sum so produced, without fraud or chicanery (which ought never to be presumed of a jury) by the whole number of jurors, as the center of mutual concession, seems to be not an unusual mode of forming a verdict in a damage suit. The vice of such a method is said to arise where there is a previous agreement among the jurors to abide by the sum so produced. On the other hand, it has been said that a verdict is not a quotient verdict though the jury acted on the suggestion that each should note the amount he thought the plaintiff entitled to and that such amounts should be added and the sum divided by twelve to ascertain the average; there being no agreement that the amount so found should be their verdict." [34 N.M. 26, 275 P. 379.]

In the instant case the foreman volunteered the information, after answering the Court's question showing that each juror put down a figure, that the figures were added and that the sum was divided by twelve, but further that after doing so "each one was asked whether they considered that the fair market value." This discounts the possibility that there was an advance agreement to be bound by the quotient reached and furthermore indicates that an opportunity was given to each member of the jury to disagree with the result thus obtained. The situation here is virtually identical with that in Hamilton v. Atchison, T. & S. F. Ry. Co., 1915, 95 Kan. 353, 148 P. 648, L.R.A.1915E, 455, wherein the court held that a judgment will not be reversed because the jury resorted to the process of addition and division, without a previous agreement that the result of such addition and division should be the verdict and where they afterward deliberated further and agreed upon a verdict.

It has been said that the basic element of the quotient verdict which is condemned is chance, and a verdict arrived at by chance should be set aside. Will v. Southern Pac. Co., 1941, 18 Cal.2d 468, 116 P.2d 44. A more discriminating view, perhaps, is that the quotient verdict is merely akin to chance since in reality each juror has arrived at his personal figure by his own judgment. The quotient represents the average of all their judgments, which however is not except by coincidence the judgment of anyone of them, and it is the considered judgment of none, except in the event of such a coincidence. Ehalt v. McCarthy, 1943, 104 Utah 110, 138 P.2d 639. Another view is that such a verdict is subject to the additional evil that any one juror intent on doing so may unreasonably increase or decrease the amount of the award. City of Dotham v. Hardy, 1939, 237 Ala. 603, 188 So. 264, 122 A.L.R. 637; Killion v. Dinklage, 1931, 121 Neb. 322, 236 N.W. 757; Southern Ry. Co. v. Williams, 1897, 113 Ala. 620, 21 So. 328. Still a further reason given for considering quotients verdicts bad is that they are reached by a method of resolving issues which is incompatible with the principles underlying the theory of trial by jury in that deliberation and exchange of opinion are foreclosed. Louisville & N. R. Co. v. Marshall's Adm'x, 1942, 289 Ky. 129, 158 S.W.2d 137. In the instant case, however, as is clearly indicated by the evidence, an opportunity was afforded to each juror after the calculation had been made, to approve of, to reject, or to discuss the result. As observed in a note in 37 Virginia Law Review 849, at page 853:

"* * * The jury system contemplates and is predicated upon the jurors' arriving at amounts of damages or extents of penalties by comparison and discussion of the amounts or extents which the various jurors think should be granted or exacted. Each individual is supposed to compare his own judgment with that of others, advance his reasons for favoring the figure he proposes, listen to the similar reasons of others, and thus in the end arrive at a decision which is considered and deliberated. The basic objection to quotient verdicts is that this entire process is omitted. Hence, if the jurors make such a calculation merely as a means of obtaining a figure with which to start the ball of discussion rolling, and use this figure for the purpose of bringing their judgments together for comparison and subsequent discussion, one would expect the courts to have little objection. * * *"

And the fact is that they don't. In Ehalt v. McCarthy, supra, the court said:

"* * * The real reason why quotient verdicts are taboo is not that they are based on chance but that they

result in the jury not arriving at a verdict of the amount granted by comparing and discussing the relative amounts which each juror thinks should be granted, and by such deliberations arriving at a just verdict. Each juror should be encouraged to compare individual judgments and in the light of the reasons given by each in support of such amounts, revise his own judgments and in the end arrive at a considered and deliberated verdict. Agreeing to abide by the total of individual judgments divided by the number of jurors results in the omission of this mental process. * * * Where it is apparent that the quotient was made the basis for further deliberation the verdict will not be set aside. * * *" [104 Utah 110, 138 P.2d 647.]

See also Armentrout v. Virginian Ry. Co., D.C.S.D.W.Va.1947, 72 F.Supp. 997, reversed on other grounds, 4 Cir., 1948, 166 F.2d 400, 4 A.L.R.2d 1064; Maryland Casualty Co. v. Gideon, Tex.Civ.App., 1948, 213 S.W.2d 848; Will v. Southern Pacific Co., supra; Claggett v. Phillips Petroleum Co., 1939, 150 Kan. 191, 92 P.2d 52.

We do not wish to encourage an impression that this procedure of addition and division has the unqualified blessing and approval of this court. Certainly it is not completely devoid of danger, for as Chief Justice Beck of the Iowa Supreme Court once said:

"Though the plan pursued * * * is not in violation of law, it trenches closely thereon, and if followed would soon by imperceptible degrees lead to the very method condemned by our decisions. It is barely on the safe side. Jurors ought to avoid such dangerous proximity to the violation of law." Hamilton v. Des Moines Valley R. R., 1872, 36 Iowa 31.

Having been indulged in, however, it becomes incumbent upon the court to scrutinize the facts and to determine whether the conduct of the jurors fell either on one side of the line or on the other. Since herein all indications are that there was not any agreement among the jurors to be bound, entered into prior to the ballot, a most essential element was lacking to constitute a quotient verdict. Sheker v. Jensen, 1950, 241 Iowa 583, 41 N.W.2d 679. To be sure, there appears to be no indication from the record that the jurors did not in fact enter into such an agreement to be bound. Were we to assume such illegal conduct, which we cannot do, it is yet possible for them to save the verdict by repudiating their agreement and proceeding thereafter to reach a verdict by proper deliberation. City of Dotham v. Hardy, supra; Western Union Tel. Co. v. Hill, 1909, 163 Ala. 18, 50 So. 248, 23 L.R.A.,

N.S., 648; Balkwill v. City of Stockton, 1942, 50 Cal.App.2d 661, 123 P.2d 596. The reconsideration which followed after the calculation as evidenced by Foreman Curry's positive testimony that "each one was asked whether they considered that the fair market value," in effect amounted to a repudiation of such prior agreement, if one was entered into.

In a number of reported cases the mere fact that the calculated finding was subsequently voted on and accepted by the jury as the legitimate expression of their deliberations, has been deemed sufficient to avoid the illegality of a quotient verdict. In most cases very little proof has been required. See Pawnee Ditch & Improvement Co. v. Adams, 1891, 1 Colo.App. 250, 28 P. 662; Commonwealth v. Anderson, 1929, 228 Ky. 90, 14 S.W.2d 392; Greeley Irrigation Co. v. Von Trotha, 1910, 48 Colo. 12, 108 Pac. 985. The facts in the case at bar are relatively stronger, however, than in these cases in which some evidence of a pre-existing agreement existed, since such element, as heretofore noted, is missing from the instant case. Absent express evidence of such a prior agreement, the presumption of the law is that the jury behaved properly. Thompson v. City of Lamar, 1929, 322 Mo. 514, 17 S.W.2d 960.

In the case of State ex rel. Senter v. Cowell, 1907, 125 Mo.App. 348, 102 S.W. 573, 575, the evidence revealed that a slip of paper was found among the ballots immediately after the jury reported a verdict, on which twelve sums were set down, aggregating a figure which, when divided by twelve, showed a quotient identical with the verdict returned. As in the case at bar there was no indication of any prearranged commitment to be bound by the quotient. The court said:

"* * * the almost unvarying rule is that a verdict based upon the average judgment of all the jurors is not illegal, where it does not appear that there was an agreement beforehand to abide by the result so obtained. And we may add that, where it does not appear affirmatively that such a prearrangement has been entered into by the jurors, the presumption of law is that it has not been made; such a presumption, as a rule, existing in all instances in favor of right acting. Applying the rule to the case at bar, we must decide the question against defendants. It is true the finding of the slip of paper mentioned does strongly indicate that the jury resorted to the average system to ascertain the individual judgment of each juror on the quantum of plaintiff's damages; yet there is nothing to show that there was any agreement beforehand to abide by the result so obtained, and, in

the absence of such a showing, we are bound to presume that there was no such agreement."

In Purcell v. Rose, 1927, 261 Mass. 431, 158 N.E. 776, the jury in an action for personal injuries returned a verdict for the plaintiff in the sum of $979.58. The presiding judge, after the verdict had been reported asked, "How did you get the fifty-eight cents, Mr. Foreman?" and the foreman answered, "We all put down what we considered the damage and divided by twelve." The appellate court, holding that the verdict was valid, said:

"The verdict of a jury ought to be a deliberate conclusion of the mind of each and every juror. But there is nothing in the record showing an antecedent agreement that notwithstanding his own judgment, each juror agreed to be bound by the result reached. The amount of damages must be presumed to be the ultimate award to which each juror freely assented as the result of his own convictions and not as a compromise. We perceive no misconduct in the mode accepted, or in the final adoption of the amount as the sum of the damages."

In Moses v. Cromwell, 1884, 78 Va. 671, a paper on which the calculations of the jurymen were made was brought forth as proof of a quotient verdict without further evidence indicating that there was a prior agreement to be bound by the result of the calculations. The court stated:

"* * * it is plain that the paper alone does not furnish such evidence as would justify the court in setting aside the verdict of the jury. Nay, it could not be said to raise even a bare suspicion that the verdict was arrived at in an irregular way, for it could not be made to appear that this process of figuration was not gone into purely for the purpose of seeing what the result would be, and that the result was finally adopted as the deliberate judgment of each juror, after full discussion and without any prior agreement to be bound by it."

See also Washington Luna Park Co. v. Goodrich, 1910, 110 Va. 692, 66 S.E. 977.

The situation in Dugat v. Hargraves, Tex.Civ.App.1931, 42 S.W.2d 683, 684 was similar to that before us. The action was brought to recover the balance due under a contract. The issue was as to the amount which the defendant had paid on account. It appeared that the jury, after deliberating for a time without reaching a verdict, had acted on the suggestion made by one of them that the respective amounts which they thought correct should be added together and divided by the number of jurors. This was done and the quotient thus

reached was accepted by the jury as its verdict. It appeared further, however, that after making the calculations, they deliberated further for two or three minutes and then by vote accepted the quotient as the verdict. The court said that the testimony of the jurors to this effect "affirmatively excludes a conclusion that any member of the jury, prior to the calculation, agreed to be bound by the result." In Consolidated Ice Machine Co. v. Trenton Hygeian Ice Co., C.C., 1893, 57 F. 898 likewise, where several computations were made and after the last one each juror assented to the result, there having been no antecedent agreement, the verdict was upheld. And in Handley v. Leigh, 1852, 8 Tex. 129, the process of striking an average as a means or step toward arriving at a deliberated verdict received judicial approval.

We thus conclude that while the verdict bordered on the danger line, it rested on the legitimate side and was not fatally defective.

The appellants herein not having prevailed in any of their arguments advanced for reversal or new trial, it follows that the judgment of the trial court must be affirmed.

It is so ordered.

SADLER, C. J., and McGHEE, COMPTON and LUJAN, JJ., concur.